FILED by ____ D.C.
ELECTRONIC

**AUGUST 5, 2008**

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### WEST PALM BEACH DIVISION

| | | |
|---|---|---|
| Kathy Ann Garcia-Lawson,<br>⟩ **Plaintiff,** | §<br>§<br>§ | # 08-80865-Civ-MARRA/JOHNSON |
| **v.** | §<br>§ | **CIVIL ACTION NUMBER:** |
| Natalie M. Garland,<br>Bill McCollum Attorney General<br>of the State of Florida,<br>Robert Butterworth, Florida Dept.<br>of Children & Families,<br>The Honorable Richard L. Oftedal &<br>The Honorable Jeffrey J. Colbath,<br>both of the Fifteenth Judicial<br>Circuit in and for Palm Beach<br>County, Florida, and<br>Michael, O. Leavitt, United States<br>Health and Human  Services,<br>**Defendants.** | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | _____<br><br><br>**Trial-by-Jury Demanded<br>As Of Right For All Issues<br>Of Fact And All Mixed<br>Questions of Fact & Law** |

_____/

## COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

1.      Jurisdiction & Venue are proper in the Southern District of Florida because all or most of the transactions and occurrences giving rise to this Complaint took place in the Southern District of Florida, to wit, in Palm Beach County; in addition, the Plaintiff and at least three of the Defendants reside in Palm Beach County.

2.      This U.S. District Court has jurisdiction arising under 28 U.S.C. §§1331, 1343, as well as over causes brought pursuant to 42 U.S.C. §§1983, 1985, and 1986, especially but

Case 0:08-cv-80865-KAM Document 2 Entered on FLSD Docket 08/06/2008 Page 2 of 100

not solely because §1983 expressly authorizes injunctions concerning and stays of state proceedings for purposes of applying and interpreting 28 U.S.C. §2283.

3.      This U.S. District Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367 over all Florida State Causes of Action stated herein below because all arise from the same case or controversy, and the same common nucleus of operative fact and law.

4.      This U.S. District Court has jurisdiction, and this court is not barred from exercising jurisdiction under the *Rooker-Feldman* doctrine, because no related state litigation has yet become final or, in fact, even had a final judgment rendered after trial as of the date of the filing of this suit.

5.      This U.S. District Court has jurisdiction, and this court should not abstain from jurisdiction, because of the plain and repeated refusal of the State Courts involved to hear the federal constitutional questions involved, because of Plaintiff's allegations and evidence of special circumstances, her challenge to the underlying unconstitutionality of the Florida statutes under which she is being prosecuted for divorce, and because of other severe irregularities in state procedures and practices leading up to dissolution of marriage, including substantial, ongoing bad faith actions and harassment (on the part of attorney Natalie M. Garland who represents Plaintiff's husband) not merely tolerated but fostered by the Court against the Plaintiff in her efforts to have her constitutional claims heard, analogous to those warranting Federal Court injunction against state proceedings in *Dombrowski v. Pfister*, 380 U.S. 479, 85 S.Ct. 1116 (1965), and those special circumstances discussed throughout this complaint which will warrant the entry of stays or injunctive relief under *Younger v. Harris,* 401 U.S. 27, 91 S.Ct. 746 (1971), and *Mitchum v. Foster,* 407 U.S. 225, 92 S.Ct. 2151 (1972).

*Kathy Garcia-Lawson's Complaint for Declaratory Judgment &*
*Injunctive Relief Regarding the Constitutionality of Florida Marriage & Divorce Law*

2

2 of 251

## HISTORICAL & SOCIOLOGICAL BACKGROUND TO THE CASE

6.    Comes now the Plaintiff, Kathy Ann Garcia-Lawson, before the court to ask this court to reevaluate one of the broadest fields of state involvement in modern life (namely family and domestic relations law) in light of one of the broadest statements of rights guaranteed by the U.S. Constitution, namely, the First Amendment:

> **Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances.**

7.    The Plaintiff herein submits that the State of Florida, by and through its various statutes, has created a system of state regulation of the family and domestic relations which systematically infringes upon each clause of the First Amendment, incorporated to the states by and through the Fourteenth Amendment to the Constitution (***Gitlow v. New York***, 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138 (1925)), routinely violates Fifth and Fourteenth Amendment Due Process, denies by the artifice of assignment in chancery the right to a trial-by-jury on what is fundamentally a question of (common or statutory) law rather than equity in violation of the Seventh Amendment, and obliterates the most important of the powers reserved to the people in the Ninth Amendment, at least in part due to the pressures imposed by Federal requirements relating to welfare and social security in Title 42 of the U.S. Code (see Fifth Cause of Action re: Title IV-D here below).

8.    Furthermore, Plaintiff submits that the entire Florida marriage and marital dissolution system (both on its face and as applied) expressly and intentionally violates and is actionable pursuant to §761.03 of the Florida Statutes expressly providing for Free

*Kathy Garcia-Lawson's Complaint for Declaratory Judgment &*
*Injunctive Relief Regarding the Constitutionality of Florida Marriage & Divorce Law*

3

3 of 251

Exercise of Religion; plaintiff is entitled to special relief under this statute because §761.03(2) provides in particular that:

> **A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief.**

9.      And Kathy Garcia-Lawson accordingly alleges that two Judges of the Florida Fifteenth Judicial Circuit, namely Richard L. Oftedal and Jeffrey J. Colbath have acted clearly in excess of their jurisdiction, thus depriving them of their judicial immunity within the meaning of 42 U.S.C. §1988(b), by DENYING Plaintiff's right to assert as defenses the burdens imposed on her religious freedom in violation of both Article I,§3 of the Florida Constitution and Fla. Stats. §761.03. Judges Richard L. Oftedal and Jeffrey J. Colbath have either acted with reckless disregard for the rights of Kathy Garcia-Lawson under the express terms of Florida law (statutory and constitutional) or else they have acted maliciously and intentionally to suppress her rights.  They should be declared unfit as judges and removed for violation of well-known & long-established provisions of law, which deprive them of any claim to immunity, whether judicial immunity be defined as absolute or qualified immunity under 42 U.S.C. §§1983, 1988 after the 1996 amendments to the same.

See also 1996 USCCAN 4216-4217.

10.     Moreover, current Florida Attorney General Bill McCollum and Secretary of the Florida Department of Children and Families (DCF), Robert A. Butterworth[1] (who was

---

[1] Bill McCollum is named in his official capacity in part because the attorney-general is entitled to notice and opportunity to defend constitutional challenges to Florida statutes under both state and Federal Law, and in part because he is currently the chief law enforcement officer of the State of Florida, charged with applying and prioritizing the state's management of the issues arising in this case.  Robert A. Butterworth is named in his personal capacity because of his long-term roll in shaping no-fault divorce and

also the former 33rd Florida Attorney General, elected and reelected for four consecutive terms between 1986 and 2002), have consistently enforced both the unconstitutional statutes and customs, practices and policies regarding the enforcement of these provisions in the Courts of the State of Florida in violation of the Florida and United States Constitutions.  These two officials are named for their continuing suppression of the rights of Florida families.

11.    Natalie M. Garland, Judge Jeffrey J. Colbath, and Judge Richard L. Oftedal, have agreed and conspired with one another, in violation of 42 U.S.C. §§1983, 1985, and 1986, to block and prevent Plaintiff Kathy Garcia-Lawson from having an even modest but reasonable opportunity to be heard on her constitutional objections to the petition for dissolution of marriage prosecuted against her by Natalie M. Garland; Judge Jeffrey J. Colbath, Judge Richard L. Oftedal, and Natalie M. Garland, in particular, as Officers of the Court, had power to prevent or aid in preventing the commission of these violations of Plaintiff's civil rights, but neglected or refused so to do, and are therefore liable to the Plaintiff pursuant to 42 U.S.C. §1986.

12.    This is a suit challenging the constitutionality of Florida statutes that are facially unconstitutional and unconstitutional as applied; Plaintiff also alleges that these statutes are unconstitutional in part due to a legislative history which suggests that these statutes were drafted and adopted for the express purpose and intention of subverting due process of law.   Furthermore, the present and former attorneys general (McCollum & Butterworth, and Butterworth as current Secretary of Florida DCF) are named since they

---

dissolution law in the state of Florida, and because of his just-recently resigned position as Secretary of the Department of Children & Family Services, to which no successor has yet been confirmed. I.E., these are the two highest Florida officials directly charged with the implementation of the Florida Statutes, customs, practices, and policies challenged in this lawsuit.

enforced and are constitutionally charged with enforcing Florida's laws relating to marriage, families, and children.

13.     The purpose of this lawsuit is to extend, modify, or repeal existing laws by having them declared unconstitutional, and to make new law to replace the unconstitutional laws and the proposal is simple. Plaintiff alleges and asks this court to declare and adjudge that neither the U.S. Constitution nor any lawful enactment made under its authority, including the Federal laws of Public Health & Welfare codified in Title 42 of the United States Code, is sufficient to justify the replacement of the power of a free people to determine their own private lives and relationships, by assembling for such purposes in Church or not, in those spheres of life such as marriage or divorce from which Congress specifically excluded federal governmental authority in 1787-1792.

14.     During the time of the adoption of the Constitution and the Bill of Rights, when even in the several states marriage and domestic relations were entirely a matter of moral philosophy and religion, until well after the adoption of the 14th Amendment when state-mandated marriage licenses became routine and customary and finally required of all persons; this expansion of state power over marriage was, however, utterly inconsistent with the fact that the 1st Amendment prohibition on establishment and regulation of religious customs and practices[2], which prior to the 14th Amendment had applied only to the Federal Government, after the 14th Amendment applied to all the states equally.

---

[2] Plaintiff Kathy Ann Garcia-Lawson herein defines religion to mean and equate to "religious customs and practices" such as the doctrinal framing and mandate to partake of the sacraments. Recently, it has become customary, practical, and political for the U.S. Courts to equate "religion" with a belief in God or other supernatural beings, or a reverence for certain signs and symbols such as the Cross, the crèche, or the two tablets of the Ten Commandments. For Kathy Ann Garcia-Lawson, as for the Founding Fathers, "religion" denoted not merely a few ephemeral beliefs about the creation and nature of the world and scattered select phrases of prayer at meetings and football games. Rather,

15.     Plaintiff alleges that the removal of the power of the state-imposed Church of England over private life was one of the great reforms sought by the colonists in first migrating to the New World and then overthrowing the King and Parliament of England, as well as the nearly contemporaneous overthrow of the French King and Etats-General of Paris, in 1789-1793 (there was reciprocal support and cooperation between many of the U.S. Founding Fathers and the French Revolution).

16.     In support of her general contentions, Plaintiff Kathy Garcia-Lawson alleges and will prove the following facts and grounds supporting her legal contentions at a trial-by-jury in support of her request for declaratory judgment that the matrimonial law of the state of Florida infringes through licensing on her religious freedom to structure her associations as she sees fit, by imposing upon her a "contract of adhesion" to which she implicitly agreed at the time of her marriage which is contrary to her religious beliefs and personal (moral) philosophy, all in violation of the First, Fifth, and Ninth Amendments to the Constitution, incorporated to the State of Florida by the 14th Amendment.

17.     'Contracts of adhesion.' refer to 'a standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the weaker party only the

_____

"religion" denoted the framework for all of one's private decisions in life.  Religion was (and is) personal philosophy and morality apart and aside from the dictates of the civil law.   That is why "atheism" and "secular humanism" have been recognized as "religions".  That is why the First Amendment Establishment Clause is so much more important than whether children can pray over their cafeteria trays in elementary school or bless the playing field before initiating the mayhem of competitive sports.  Plaintiff submits that it is part of the conspiracy to distract and deceive the American people that so much attention has been paid to school prayer, tax exemptions for religious organizations, and the inclusion of "In God We Trust" on the currency.  The real meaning of religion in society is setting up the customs and norms of everyday life for all religious people (including those whose philosophy denies the existence of a deity or super-natural realm all together).  The Latin root meaning of the word religion is "constraint, scruple, sanction, conscientiousness" in regard to obligations.  Pocket Oxford Latin Dictionary 1994, 2005: 161.  "As a quality of persons, scrupulousness, conscientious exactness".  Cassell's Latin Dictionary, D.A. Simpson, Wiley Publishing, New York (1968): 511.

opportunity to *adhere* to the **contract** or *reject* it.' ***Pasteur Health Plan v. Salazar***, 658 So. 2d 543, 544-45. 1995 Fla. App. LEXIS 4649; 20 Fla. L. Weekly D 1083 (Florida 3rd DCA 1995)(citations omitted, except see ***Madden v. Kaiser Found. Hosps.***, 17 Cal. 3d 699, 552 P.2d 1178, 131 Cal. Rptr. 882 (Cal. 1976)(establishing three-part test for determining when a **contract** is a **contract** of **adhesion**).

18.    The main difference between the state-imposed marital contract and an ordinary contract of adhesion is that, typically, on the day of the issuance of a marriage license, it is not clear who will "strike first" to seek a divorce, but THAT party (the ex-ante unknown Petitioner in a Florida divorce proceeding) will be the "stronger" party who holds ALL the advantages of certainty of outcome (namely that a divorce will be granted) while the (equally ex-ante unknown) respondent will have no bargaining power at all. As a practical matter, the doctrine of clean hands ONLY applies to property division in Florida, occasionally to child custody or support, and NEVER to the question of whether a divorce will be granted in favor of the Petitioner or not.

19.    Plaintiff Kathy Garcia-Lawson alleges that this state-authored and imposed contract of adhesion surreptitiously applied at the time of purchase of a marriage license upon the married couples of Florida is not only a woeful, outrageous, and barbarous infringement upon all her rights of privacy, individual autonomy, self-determination, and in particular upon all five of the freedoms guaranteed by the First Amendment, but this state authored and imposed contract of adhesion is also anathema to Fifth Amendment Due Process of Law, to the Ninth Amendment reservation of all un-enumerated rights to the people, and offensively breaks the Fourteenth Amendment guarantee of Equal Protection under the Law by creating a disfavored class of Petitioners who are defined

SOLELY by the timing of their status as petitioners and respondents; Kathy Garcia-Lawson submits and contends that this arbitrary and capricious classification of individuals as petitioners or respondents creates a de facto disfavored "status" of individuals, wherein [especially, like the Plaintiff, wholly involuntary] respondents have a social (and more importantly, litigation status within court) not unlike now recognizably unconstitutional categories or classes of individuals called "vagrants" or "criminals" or "streetwalkers" who can be convicted and stigmatized for their STATUS rather than any particular unlawful actions or omissions.  (See, e.g. ***Papachristou v. City of Jacksonville*, 405 U.S. 156, 169-170 (1972)):**

> A direction by a legislature to the police to arrest all "suspicious" persons
> would not pass constitutional muster[3].  A vagrancy prosecution may be merely
> the cloak for a conviction which could not be obtained on the real but
> undisclosed grounds for the arrest. ***People v. Moss,*** 309 N. Y. 429, 131 N. E.
> 2d 717. But as Chief Justice Hewart said in ***Frederick Dean***, 18 Crim. App.
> 133, 134 (1924):
> "It would be in the highest degree unfortunate if in any part of the country
> those who are responsible for setting in motion the criminal law should
> entertain, connive at or coquette with the idea that in a case where there is not
> enough evidence to charge the prisoner with an attempt to commit a crime, the
> prosecution may, nevertheless, on such insufficient evidence, succeed in
> obtaining and upholding a conviction under the Vagrancy Act, 1824."
> Those generally implicated by the imprecise terms of the ordinance - poor
> people, nonconformists, dissenters, idlers - may be required to comport
> themselves according to the lifestyle deemed appropriate by the Jacksonville
> police and the courts. Where, as here, there are no standards governing the
> exercise of the discretion granted by the ordinance, the scheme permits and
> encourages an arbitrary and discriminatory enforcement of the law. It furnishes
> a convenient tool for "harsh and discriminatory enforcement by local
> prosecuting officials, against particular groups deemed to merit their
> displeasure." ***Thornhill v. Alabama***, 310 U.S. 88, 97 -98. It results in a regime

---

[3] And Plaintiff contends herein that a direction by a legislature (or a custom, practice, and policy by judges) to divorce all respondents from all petitioners, likewise either places too much arbitrary and capricious discretion in the hands of judges, or alternatively deprives them of any meaningful discretion actually to look into the circumstances of individual cases and make a decision informed by the evidence and testimony.  A respondent in a Florida divorce suit knows full well that when the petitioner files his divorce paperwork, it's all but a "done deal."

*Kathy Garcia-Lawson's Complaint for Declaratory Judgment &*
*Injunctive Relief Regarding the Constitutionality of Florida Marriage & Divorce Law*

9

in which the poor and the unpopular are permitted to "stand on a public sidewalk . . . only at the whim of any police officer." *Shuttlesworth v. Birmingham*, 382 U.S. 87, 90 . Under this ordinance,

"[I]f some carefree type of fellow is satisfied to work just so much, and no more, as will pay for one square meal, some wine, and a flophouse daily, but a court thinks this kind of living subhuman, the fellow can be forced to raise his sights or go to jail as a vagrant." Amsterdam, *Federal Constitutional Restrictions on the Punishment of Crimes of Status*, [405 U.S. 156, 171] *Crimes of General Obnoxiousness, Crimes of Displeasing Police Officers, and the Like*, 3 Crim. L. Bull. 205, 226 (1967).

A presumption that people who might walk or loaf or loiter or stroll or frequent houses where liquor is sold, or who are supported by their wives or who look suspicious to the police are to become future criminals is too precarious for a rule of law. The implicit presumption in these generalized vagrancy standards - that crime is being nipped in the bud - is too extravagant to deserve extended treatment. Of course, vagrancy statutes are useful to the police. Of course, they are nets making easy the roundup of so-called undesirables. But the rule of law implies equality and justice in its application. Vagrancy laws of the Jacksonville type teach that the scales of justice are so tipped that even-handed administration of the law is not possible. The rule of law, evenly applied to minorities as well as majorities, to the poor as well as the rich, is the great mucilage that holds society together.

20.   The elements of this State-created, State-mandated, and State-enforced "contract of adhesion," over which the parties have NO bargaining power at all (until one becomes the Petitioner in a divorce action) are:

(1) that secular marriage is a creature of the state, and even clergymen act as agents of the state rather than servants of God in the solemnization of marriage,

(2) that secular marriage is easy to obtain, but that the only "right" available to persons married according to a secular marriage license which is not available to unmarried people in the State of Florida (at least, in that Florida does not recognize "common law marriage" as it exists in many states), is the right to obtain a divorce[4],

---

[4]   [a]nd thereby support a 2 billion dollar per year industry (namely the Divorce Industry, consisting of lawyers, custody evaluators, court-appointed psychologists, mediators, court reporters, and all other professions that benefit financially from the

(3) that one party alone may force a divorce, commonly labeled "no fault," to which no effective answer or contest will ever be allowed,

(4) that this contract of adhesion itself has the sole purpose of redefining marriage as an instrument of an authoritarian governmental policy, and as a means of breaking down the family through divorce and thereby increasing the State's power over individuals, especially the women and children of non-consensual divorces,

(5) that the ultimate purpose of secular marriage then is redistributive and communistic (not only with regard to spouses but especially children) and that this communistic system was imposed in two steps: first by the licensing of marriage as a public means of enforcing private welfare interests in the early 20th century and then by "no fault" divorce as a means of hopelessly scrambling society and the social order during the chaotic days of the 1960s and 1970s during the Cold War when the United States was doing everything it could to imitate the Soviet Union so as to "compete" more effectively. (See EXHIBIT A: Affidavit of Judy Parejko, in which she concludes that no-fault divorce has been operating as a well-kept open secret as it fulfills one of the goals of the Communist Manifesto: "Discredit the family as an institution, encourage promiscuity and easy divorce."). The bottom line was this: the secular state marriage license was to be handed out freely, without instruction or guidance, but it opened the door (via the undisclosed implicit agreement to the "contract of adhesion" relating to secular-

---

breakup of families, such as realtors, accountants, therapists, etc.) which does nothing to increase human happiness or wealth of the collective population (aside from acting as an involuntary redistributive mechanism to increase the wealth and power of divorce lawyers).

*Kathy Garcia-Lawson's Complaint for Declaratory Judgment &*
*Injunctive Relief Regarding the Constitutionality of Florida Marriage & Divorce Law*

11

state divorce) to State intrusion upon all individual "privacy interests" including but not limited to "the upbringing and education of children and the intimacies of the marital relationship."

21.    Plaintiff specifically asks this court in her Complaint for Declaratory Judgment that the court build on, clarify, expand, and evaluate the origins and scope of the holding of the U.S. Supreme Court in *Hodgson v. Minn.*, **497 U.S. 417, 446, 110 S.Ct. 2926, 2943 (1990), in which Justice Stevens wrote:**

> While the State has a legitimate interest in the creation and dissolution of the marriage contract, see *Sosna* v. *Iowa*, 419 U.S. 393, 404, 42 L. Ed. 2d 532, 95 S. Ct. 553 (1975); *Maynard* v. *Hill*, 125 U.S. 190, 205, 31 L. Ed. 654, 8 S. Ct. 723 (1888), the family has a privacy interest in the upbringing and education of children and the intimacies of the marital relationship which is protected by the Constitution against undue state interference.

22.    The structure of personal relationships is quintessential privacy, guaranteed and protected by the 1st Amendment to the U.S. Constitution, and reaffirmed as recently as *Lawrence v. Florida* and *Planned Parenthood v. Casey* decisions in regard to substantive due process.

23.    Further, Plaintiff Kathy Garcia-Lawson alleges that she has personally and individually been injured by the Florida secular-licensing and no-fault divorce statutory scheme in each of the following ways:

(1)    The Fifteenth Judicial Circuit in and for Palm Beach County, Florida, has failed and/or refused to allow her to plead evidence or dispute that her marriage is "irretrievably broken" despite the fact that such a finding is said to be an essential and not at all automatic element of the decision of a petition for "no fault divorce". See *Ryan v. Ryan*, 277 So.2d 266 (Florida 1973).

(2)     The Fifteenth Judicial Circuit seeks to force Plaintiff to fulfill all preliminary requirements for the granting of a divorce, including mediation, including proceeding [at times] without counsel, and even including facing the probable outcome that the ministerial entry of a divorce decree will precede the trial of the division of marital assets, all in violation of Fifth Amendment due process of law which requires that no person be required to testify against herself, and of the Seventh Amendment mandate, at the very least, that a trial-by-jury should be available in all cases regarding a controversy exceeding $20 (the interpretation of the distribution of assets under the contract of marriage, whether it be a contract of adhesion imposed by the State post-facto or an actual negotiated agreement between the parties, is plainly a matter arising under the common law).

(3)     Plaintiff Kathy Garcia-Lawson has been utterly denied her right to procedural due process: stripped of any meaningful right to express her religious beliefs (and to enforce the religious covenant with her husband) against divorce and in favor of the teachings of her Church and Faith;

(4)     It is difficult to assign a dollar value to due process rights to First Amendment freedoms, but the U.S. Supreme Court has repeatedly held that such freedoms are presumed to have highest value and priority over other interests and considerations. "Freedom of press, freedom of speech, freedom of religion are in a preferred position." *Murdock v. Commonwealth of Pennsylvania*, 319 U.S. 105, 63 S.Ct. 870, 146 A.L.R. 81, 87 L.Ed. 1292 (1943); see also *Grosjean v. American Press Co.*, 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660 (1936 re: "freedom to think and receive information.")

(5)     The economic focus of marriage dissolution proceedings in the Florida courts effects an automatic taking of property without due process of law by categorizing elements of an estate as "marital" or "non-marital"; this is another element and aspect of the contract of adhesion imposed by the state without the knowledge of notice to, or informed consent of the parties (unless they both happen to be Florida matrimonial lawyers); Kathy Garcia-Lawson alleges an illegal "taking" of property DURING and BY the divorce process itself in excess of $250,000.00 in legal fees, plus personal injuries.

24.     Kathy Garcia-Lawson also asks this court, in the present action, to disavow and disown, to alter, change, extend, and modify existing law, or to make new law, by repudiating the following passage from *Ryan v. Ryan*:

> We have heretofore held that the authority to regulate marriages and correspondingly to provide for their dissolutions is vested in the Legislature. It is inherent in the state's police power to do so in the regulation of society and its relationships, including the very essential and important family relationship within marriage. The marriage contract perhaps more than any other has a vital and essential effect on the very life and society of the State and therefore is a very proper subject of the State's police power; the subject of marriage (and correspondingly the dissolution thereof) has a very definite bearing upon the public interest with which the Legislature is concerned and charged with its regulation.

277 So.2d at 273 (Florida 1973)(citations & footnotes omitted).

25.     Strangely enough it was the Florida Supreme Court itself, in the versa me *Ryan* decision, which pointed out the fatal flaw in its affirmation of the "vesting" of "authority to regulate marriages and correspondingly to provide for their dissolution" in the Legislature. That flaw is that, although the sacrament of marriage pre-existed the State of Florida, and of the United States itself, and in fact is an institution predating even the very most ancient roots of the Anglo-American legal system in the statutes of the West

Saxon King Alfred and the Anglo-Danish King Canute, the law relating to a licensed marriage is barely half the age of the 27th State:

> Petitioner challenges the authority of the Legislature to extend the law to "grant" dissolutions upon a new, simplified test of whether the tie is "irretrievably broken." It is urged as unconstitutional to apply the new law to existing contracts of marriage entered into under the prior law which, it is claimed, was a part of that marriage contract - now being "broken" by legislative action without due process of judicial considerations of notice and hearing. The only trouble with this contention is that the "remedy" (the procedure provided in the new law for dissolution) is the ongoing prerogative of the Legislature which also legislates the marriage in its creation. ". . . the Lord gave, and the Lord hath taken away." [11]

11  Job 1:21.

277 So.2d at 274 (*supra*).

26.     What a despicable irony that the Supreme Court of Florida would quote the Bible in an opinion striking at the very heart of some of the most important Christian teachings. But the Florida Supreme Court was clearly correct on this one point: what the state defines, the state can destroy. And what a despicable Communistic implicit assertion the Court is making in this quote from Job, namely that "God is the State, the State is God"---in this Brave New World where marriage and love are throwaway trinkets, relics, like true freedom, of a decadent Capitalistic Bourgeois past in which the protection of Family and Private Property were the SOLE LEGITIMATE purposes of the Constitutional State.

27.     At the time of the adoption of the U.S. Constitution, marriage/baptism and every other aspect of family structure was a matter of RELIGION/RELIGIOUS CHOICE, and must be seen as protected from governmental interference by the Establishment Clause.

28.     The licensing of marriage is fundamentally unconstitutional because it is the imposition of a state requirement on what was understood to be religious activity just as the state licensing of missionary preachers was held unconstitutional in *Follett*

*V. Town Of McCormick, S.C.* 321 U.S. 573, 64 S.Ct. 717, 152 A.L.R. 317, 88 L.Ed. 938 (1944), as was the taxing and sale of religious books and articles in *Murdock v. Commonwealth Of Pennsylvania and seven other cases,* 319 U.S. 105, 63 S.Ct. 870, 146 A.L.R. 81, 87 L.Ed. 1292 (1943), and in its jurisprudence under 42 U.S.C. §§1983, 1988, the Supreme Court has repeatedly held that longstanding customs which violate constitutional rights are no less pernicious than recently invented statutory violations because "The power to tax the exercise of a privilege is the power to control or suppress its enjoyment" and "A state may not impose a charge for the enjoyment of a right granted by the Federal Constitution". *Murdock*, 319 U.S. at 112-114, 63 S.Ct. at 874-875.

29.     Recent sociological and psychological research has focused on no-fault divorce in particular (although it must be admitted that "no fault" divorce is an obvious corollary of state-licensed marriage, available within 3 days without religious or spiritual counseling) shows that no-fault divorce is socially destabilizing and psychologically injurious. Plaintiff alleges and will show by competent expert testimony and statistics that murder rates are correlated with divorce rates and the children raised by single parents or even in "mixed" households are much more likely to be arrested and incarcerated for all kinds of crimes (not merely just drug and alcohol related crimes or those relating to emotional disturbance or depression) than children raised by both their natural parents in a stable home.  Plaintiff will also show the other ill effects of divorce on children and society, effects that repeatedly have been marginalized or dismissed.

30.     Historical research also reveals that no-fault divorce was introduced by deception and mistake during the 1960s-70s, and it can be shown that the licensing of marriages was adopted by deception and mistake in the 19th-early 20th Centuries.

31.    Since No-Fault Divorce (or readily available divorce of any description) is a LOGICAL and possibly even LOGICALLY NECESSARY corollary of STATE-SPONSORED SECULAR MARRIAGE, then just as the Church of England was removed from its "established" Status in Virginia and the Carolinas during the Revolution, the Anti-Religious State-Sponsored Secular Marriage must now be dis-established as a matter of constitutional reform under the "excessive entanglement" test originated by the Supreme Court in *Lemon v. Kurtzman*, 403 U.S. 602, 29 L. Ed. 2d 745. 91 S. Ct. 2105 (1971), and (despite considerable criticism) applied consistently since then, see e.g. *Tangipahoa Parish Bd. of Educ. v. Freiler*, **530 U.S. 1251,** 120 S. Ct. 2706, 147 L. Ed. 2d 974 (Justice Scalia dissenting from the affirmation of the Fifth Circuit's decision in 185 F.3d 337, 1999 U.S. App. LEXIS 18932). As Justice Scalia correctly observed, "Under the second prong of *Lemon*, the "principal or primary effect [of a state action] must be one that neither advances nor inhibits religion." *Lemon*, 403 U.S. at 612. It is beyond question or reasonable doubt that the state (secular) licensing of marriage, followed by the enactment and enforcement of "no fault" divorce have had the effect of inhibiting traditional religion (whether Judeo-Christian, Islamic, or Hindu) and advancing the causes either of atheism or secular-humanism.

32.    The Explosion of Gay Rights highlights and underlines the essential flaws between secular and religious marriage in America: several states are now dictating to the CHURCHES how they must perform and authorize marriage, although the explosive evolution of family law since the enactment of "no-fault" divorce has become a classic case of not merely state "impairment" of contract but state "dictation" of contracts of adhesion with "one size fits all" applicable to every family and family situation. The

contradiction is appalling; this state-coerced modification and restructuring of private lifestyles dictated throughout the nation's fifty state codes of family and domestic relations law is un-American in the extreme.

33.     The consistency of Substantive Due Process which has expanded abortion rights and gay rights is clearly inconsistent with the devaluing and secularization of the marriage rites (and the terms of the "contract of marriage": if the "choice" of life or death of certain fetuses is a private decision, then all aspects of sexual and private life should be beyond state regulation as well for the simple reason that if the State cannot effectively regulate sex based on moral choice of the majority, the state should not be allowed to regulate the moral choices of the minority either. That is the core and the essence of the First Amendment, read together with the 5th and 9th Amendments, applied to the States through the 14th.

34.     Collateral doctrines of judicial intervention and rule-making and micro-management of personal life and expression have expanded along with the state's role (implemented mostly by judges) in the control of the family and its day-to-day life. Plaintiff's complaint addresses these issues, such as the ability of a judge to issue private injunctions regarding speech between private individuals, and the immunity of judges to complaints that they have violated constitutional rights.

35.     Even the right of the people to challenge, by the traditional writ of *quo warranto*. the authority of secular state judges to prejudge and announce regulations of the constitutional and religious rights of families, has been narrowed during the "no fault divorce" years.    Plaintiff accordingly proposes that this court apply the 1996 Amendments to 42 U.S.C. Sections 1983 and 1988 in light of the legislative history of

these amendments (1996 USCCAN 4216-4217) which will permit more private and individual assertions of rights when violated by legally activist or subversive judges who act clearly in excess of their jurisdiction by bending, determining, or extending laws beyond what is necessary to the decision of any real immediate dispute.

36. There is substantial precedent for using sociological and psychological (and other statistical) evidence to allege violations of civil rights, including violations of due process, in the implementation and enforcement of the Florida family and domestic relations codes.

37. Title 42 Public Welfare and the Florida Family and Domestic relations statutes are increasingly coordinated by legislative enactments, which show thereby that there is a critical economic motivation behind the state's absorption of the traditional provinces of private, religious, and family life.

38. Plaintiff alleges that the Title 42 Welfare intrusion into the state-shaping of the family and domestic relations codes violates 9th-10th Amendment rights of the Sovereignty of People and the States (and in context can be seen as another deceptive and misleading manipulation of history to implement and justify a constitutional violation).

UNCONSTITUTIONAL REFUSAL TO ENTERTAIN THIS PLAINTIFF'S CONSTITUTIONAL CHALLENGES IN THE 15TH JUDICIAL CIRCUIT COURT

39. As allowed pursuant to the clarification of the *Rooker-Feldman* doctrine in *Exxon-Mobil v. Saudi Basic Industries* 544 U.S. 280, 125 S.Ct. 1517, 161 L.Ed.2d 454 **(2005) and *Marshall v. Marshall,*** 547 U.S. 293, 126 S.Ct. 1735 (2006), Kathy Garcia-Lawson has also filed a parallel action in state court with venue in Leon County (Tallahassee) under Cause Number 37 2008 CA 002304. The State Court venue in Leon County is proper due to 15th Judicial Circuit Court Judge Jeffrey J. Colbath's and Judge

Richard L. Oftedal's persistent failure or refusal to allow constitutional arguments regarding the nature of marriage and the validity and viability of certain affirmative defenses, such as Kathy Garcia-Lawson's assertion that her marriage is NOT irretrievably broken (Judge Colbath who recused himself was succeeded by Judge Oftedal, but both judges appear to support and implement the same unconstitutional customs, practices, and policies).

40.   Plaintiff Kathy Garcia-Lawson did everything she could to bring the issues in this complaint as part of her defense, answer, and counterclaim to her husband's divorce action in Palm Beach County, but she has not been allowed to do so.

41.   This case has arisen at least in part because of Kathy Garcia-Lawson's realization that the problem is not with her or even with her husband, but with the judges who knowingly thwart due process of law by granting every moving party a "victory," with this unconstitutional custom, practice, and policy being necessary to implement the Florida Courts' systemic and systematic refusal to treat marriage as anything but a state-created and state-regulated (i.e. licensed) institution, to be allowed or abolished at the state's sole discretion (state discretion being implemented by judges and lawyers who profit and increase their power by-and-through conflict, but whose power is threatened or diminished by the preservation of the family as a strong and free institution represented by strong and free husbands and wives who act as parents for strong and free children.)

42.   Plaintiff's awareness of all this (the State vs. the Family and the Institution of Marriage) began when Jeffrey Lawson filed his Verified Petition for Dissolution of Marriage from Plaintiff Kathy Garcia-Lawson on February 1, 2005, in the 15th Judicial Circuit Court in and for Palm Beach County, but the question of due process of law

became focused when Plaintiff herein, Kathy Garcia-Lawson, on March 30, 2005 filed her Answer to Husband's Petition for Dissolution, namely her affirmative defenses denying that the marriage was irretrievably broken, and found out that neither the courts nor attorneys would seriously entertain this defense at all. After considerable research and review of legal documents in the area of family law, Plaintiff became educated about the legal court process of the breakdown of the marriage.

43.     What Plaintiff rapidly learned is that it is impossible for a respondent to effectively litigate this key element of the definitive grounds for "no fault" divorce in Florida: it is impossible to prove or disprove whether a marriage is irretrievably broken, and Plaintiff Kathy Garcia-Lawson rapidly concluded that the denial of her right to litigate this point meant that no-fault divorce simply cast an illusion of judicial process in order to fool people: that it was merely the "entry ticket" by which the Courts and the state take over the family.

44.     The legislative history of the adoption of Fla. Stats. § 61.052, often referred to as "no fault" dissolution of marriage, demonstrates that the Florida judiciary, the Florida legislature, and the Florida public were deliberately misled and defrauded about the nature of this statutory enactment.

45.     Plaintiff alleges that this fraudulent legislative history of "no fault divorce" in Florida requires that this statute (or constellation of statutes) be declared unconstitutional, null and void, and stricken as both interfering with fundamental liberty with no compelling state purpose to which no fault divorce was narrowly tailored to remedy, and further, that no fault divorce was adopted without rational basis.

46.     In other words, whether strict scrutiny or rational basis analysis applies, Plaintiff asks this court to declare "no fault" divorce to be unconstitutional, and will show by sociological and psychological evidence that "no fault divorce" as the mirror image of state-licensed marriage, is so defective as a social policy that there is a strong state (i.e., public benefit) purpose (as well as a constitutional necessity) to abolish both state-licensed marriage and state dissolution of marriage, so that the family and domestic relations of the people are left entirely to the people as required by the 1st, 5th, 9th, and 14th Amendments to the Constitution of the United States.

47.     The members of the National Conference of Commissioners on Uniform State Laws ("NCCUSL") were fully aware of the Constitutional problems with their "model law" that was known as the "Uniform Marriage and Divorce Act," (UMDA) including changing the role of the judiciary into a ministerial function, of the lack of a definition or defenses for "irretrievable breakdown," and of the due process problems that are created, all of which were approved by the American Bar Association's House of Delegates in 1974, but Florida legislators didn't wait for that approval: in 1971 the Florida House introduced a slightly-tailored version of the UMDA which Governor Reubin Askew signed into law six months later.  (See EXHIBIT B, a brief history of the national "uniform divorce" law project, and its end-product, "no-fault" divorce, which was incorporated into Florida law, with additional attachments.)

48.     Plaintiff, Kathy Garcia-Lawson who was sued for divorce, swiftly discovered from Judges Colbath and Oftedal, her own attorneys, and her husband's attorneys and counselors at law that she can never establish a lack of merit in her husband's suit nor a legal bar to it. She alleges that a no-fault divorce suit has the distinction of being the only

suit in any American court wherein the moving party cannot lose, at least with regard to the core issue of dissolution of the marriage, so long as the parties are married according to the state's licensing procedure, or some equivalent.

49. It appears from the historical record of Palm Beach County that neither the Honorable Richard L. Oftedal nor any other judge in the Plaintiff's home (Palm Beach) county (or, insofar as known to the Plaintiff, anywhere elsewhere in Florida) have ever **judicially denied** any petition for divorce (See EXHIBIT C: Plaintiff's Affidavit which includes a report that more than 31,000 divorces were granted in Palm Beach County in a five-year period and none were judicially denied.)

50. The courts are thus merely serving in a ministerial rather than a judicial capacity, since they are "rubber-stamping" divorce decrees as was conducted in Soviet Russia under a procedure called 'Post Card Divorce.' (Plaintiff herein incorporates by reference EXHIBIT D: two articles on Soviet Russian law – see especially page 38 of the Bolas article where he describes 'Post Card Divorce,' and also the opening paragraph in the Gsovski article, which eerily describes contemporaneous American marriage and divorce law, even though the article was written in 1947 and is actually describing the early post-Revolutionary (1917) Soviet law-changes).

51. Plaintiff alleges and will prove as a matter of fact at the trial-by-jury of this case that the State of Florida is abusing its police power in order to coerce Plaintiff into (i) consenting to the divorce and (ii) colluding with the state in its intentional infliction of emotional and psychological harm on minor child. At the time that no-fault divorce was being promoted as public policy, the social science research was either unavailable or purposely ignored, with reports going back to the 1920s revealing that divorce dealt a

devastating blow to children's psyche. Transcripts of the 1971 Florida House Floor Debate reveal that concern for the welfare of children was limited while the greatest concern was focused on the issue of alimony payments to wives. The self-interests of adults far outweighed the interests of children during the national and the Florida no-fault debates. (See EXHIBIT E, a law review article by Helen M. Alvare, "The Turn Toward the Self," see esp. pages 146-153, which describes how adult interests predominated over children's interests,[5] as well as pages 137-143, outlining the hypocrisies behind the move to no-fault divorce.)

## Specific Causes of Action

### First Cause of Action:
### DECLARATORY RELIEF – GENERAL CONSTITUTIONAL QUESTIONS
### (28 U.S.C. §§2201, 2202, 42 U.S.C. §§1983, 1988

52.     Plaintiff re-alleges all her material statements and assertions of present and historical fact and legal contentions set forth in ¶¶ 1-51 of this Complaint and incorporates the same by reference as if fully copied and restated herein below.

53.     An actual and living controversy exists between Plaintiff Kathy Garcia-Lawson, her husband's attorney Natalie M. Garland (who has violated the Plaintiff's civil rights, as alleged above) at least two Judges of the 15th Judicial Circuit Court of Palm Beach County, and the Florida Attorney General and Secretary of DCF regarding these questions, and this controversy has been the cause of actual injury to the Plaintiff Kathy Garcia-Lawson, namely intrusion on her fundamental civil rights secured by the 1st, 5th,

---

[5] The evaluation of the consequences of these facts for the welfare and civil rights of children must be left to a future lawsuit.

7th, 9th, and 14th Amendments to the U.S. Constitution, resulting in at least $500,000.00

actual monetary loss.

54.  Succinctly stated, the Federal Constitutional Questions which this Federal Court

is being given the first opportunity to decide are:

> **I.    Is it a Fourteenth Amendment Due Process violation to force an individual before a tribunal to answer to a complaint where no factual allegations of wrongdoing have been alleged and where defenses have been removed by statute?**
>
> **II.    Is it a Fourteenth Amendment Due Process violation to grant a petitioner relief against a respondent's substantive right, where no factual allegations of wrongdoing have been alleged, the respondent objects, and no serious penalty is attached for the violation of "more than a contract"?**
>
> **III.    What are the Constitutionally compliant defenses against a claim of "irretrievably broken" unsupported by facts and for which there is no defined legal defense?**
>
> **IV.    Where a Defendant (Respondent), such as Kathy Garcia-Lawson who is sued for a divorce, can never defend by showing a lack of merit in the suit or assert a legal bar to it, is this a prima facia violation of due process or denial of equal protection?**
>
> **V.    If "no fault divorce" is the only claim in an American Court, where the moving party cannot lose if the parties were married by the licensing power of the state, does this have the effect of discriminating against respondents in divorce cases, creating an irrational (and therefore, unconstitutional) disfavored class of individuals defined solely by (a) having entered into a state-licensed marriage and (b) being the respondent in a secular "no fault" divorce case?**
>
> **VI.    Where a Judge, such as the Honorable Richard L. Oftedal or Jeffrey Colbath has (as can be shown as a matter of historical fact) never judicially denied any petitions for divorce, is this Judge serving in a ministerial rather then a judicial capacity, since he is or appears to be "rubber stamping" divorce decrees as was first formulated and conducted in Russia and called the Russian 'Post Card Divorce'? (See Exhibit D, two articles showing the similarities between contemporaneous American and 1917 Soviet Russian marriage and divorce laws).**

**VII.    Does the State of Florida abuse its police power in coercing Plaintiff Kathy Garcia-Lawson to (i) consent to the divorce and (ii) collude in the state's infliction of emotional and psychological damage on their minor child?**
**(The social science research, unavailable at the time the NCCUSL drafted the UMDA and sold it to the Florida State Legislature, is now available and attached; see Exhibit F, "The Effects of Divorce on America.")**

55.    Kathy Garcia-Lawson's case appears to be one of first impression. Plaintiff herein alleges that her fundamental liberty interest in marriage and a basic civil right to privacy and the determination of her own lifestyle and "pursuit of happiness" therein is obliterated, rendered nugatory, by the Florida "no fault divorce statute" which is itself a direct and proximate result of the unconstitutional state licensing of a traditional religious sacrament.

56.    The fundamental right to marriage is and has historically been judicially treated as related to the fundamental freedom to contract (although, because of sacramental dependence upon First Amendment Freedom of Religion has often been described as "more than a contract"), so that the state's infringement on the right of parties to contract freely for marriage without a state-mandated "contract of adhesion" is also a violation of 42 U.S.C. §1981 which simultaneously but absolutely denies one class of individuals (unwilling respondents in divorce actions) both equal protection of the law and equal access to the courts for vindication of their rights, creating an irrationally, arbitrarily and capriciously formed class of favored persons, namely divorce Petitioners, whose rights are uniformly superior to those of divorce; Natalie M. Garland, in her role as legal counsel to husband, shamelessly exploited the prejudices underlying this irrational, unconstitutional denial of the equal protection of the laws.

57.    Plaintiff alleges that the State of Florida has stripped both the secular contract of marriage and the sacrament of marriage of all legal meaning (in the context of litigation with the other party to the secular contract, and one of two other parties to the sacrament, the third being God), in that the State of Florida has deprived Plaintiff of all possible defenses to the express breach of the secular contract and the violation of the sacrament (i.e. dissolution), removed primarily by the laws codified as Florida Statutes §61.00 et seq., so that unilateral dissolution of marriage has been authorized and implemented in Florida up to this point without evaluating the devastating collateral First and Ninth Amendment consequences which are the subject of this lawsuit.

58.    Pursuant to Florida General Statutes §86.011, et al, declaratory relief is a proper mechanism at law for determining the rights and responsibilities of the parties.

59.    Pursuant to Florida General Statutes, injunctive relief is a proper mechanism at law for enjoining the operation of Florida Statutes §61.052 which allows for a determination of "irretrievable breakdown" without defined defenses at law.

60.    **WHEREFORE**, it is respectfully requested that this court determine the responses to the above seven questions or to certify them as questions of great public importance, to find that Counter-Defendants are in violation of the constitution by allowing dissolution to be entered based on "irretrievable breakdown" without a factual basis, as well as the following:  Enter an injunction against Defendants, requiring that Defendants refrain from enforcing the dissolution based on the "irretrievable breakdown theory" without the proper ruling from the Court on the constitutionality of the matter.

61.    (a) Recognize that the Constitutional questions raised by this complaint are of great public importance and that the need to remedy these fundamental questions of right,

established by both the Federal and, even more clearly, Florida constitutions, justified intervention in state proceedings under both *Dombrowski v. Pfister* and *Younger v. Harris* in that the rights involved are fundamental, First Amendment rights which go to the very core structure of society and government and (b) therefore and accordingly declare the rights and responsibilities of the parties under the law.

62.     Grant Plaintiff's Prayer for injunctive relief permanently to end and terminate (i.e. enjoin) the operation of statutes that interfere with and abridge appropriate Fourteenth Amendment procedural due process.

63.     Order such other and further relief as this court deems just and proper under the circumstances.

64.     Grant Plaintiff a judgment for reasonable attorney's fees, costs and interest; and

65.     Enter all such other and further relief as this court deems just and proper, including all orders necessary to effect the implementation of these Constitutional Declaratory Judgments.

<div align="center">

**Second Cause of Action: 42 U.S.C. §§1983, 1988**
**Itemization of Florida Marriage Statutes Infringing upon the First Amendment**
**Establishment of Religion, and Creating Excessive Entanglement between**
**government and religious affairs within the scope of *Lemon v. Kurtzman***

</div>

66.     Plaintiff realleges ¶¶1-65 of her Complaint and incorporates all material factual allegations and legal contentions as if fully copied and restated herein below.

67.     Plaintiff alleges that, as held by the Florida Supreme Court in *Ryan v. Ryan, supra,* the infringements on Plaintiff's substantive and procedural due process rights by the Florida Courts' customary, practical, and political implementation of the divorce laws is entirely the result of the Florida Legislature's exercise of control and dominion over the institution of marriage.

68.     Plaintiff alleges that the Florida legislature has deprived her of her religious freedom by such implementation, in violation of the First and Ninth Amendments, and that her religious freedom (specifically, her fundamental right to be free from involuntary dissolution of her Godly (sacramental) marriage by the secular state) can only be restored by the abolition of state-control over the sacrament of marriage.

69.     In support of her contention, Plaintiff will show that the State of Florida, by and through its legislative enactments, has specifically and expressly subordinated and incorporated the institutions of religious and sacramental instruction and religious observation, and has specifically and expressly made religious duties and observations subordinate to the power of the state in regard to all matters relating to the most private aspects of life, called "the intimacies of the marriage relationship" by the U.S. Supreme Court in Hodgson, quoted above.

70.     Title 43, Chapter 741: Fla. Stats. §741.01 makes all Florida marriages subject and subordinate to secular state officials, namely state court judges, giving the power of *ius vita necisque* (power of life and death) over marriage, a sacrament of Plaintiff's Faith and Church, to the state, in violation of the Establishment Clause of the First Amendment to the United States Constitution and the reservation of all un-enumerated powers as rights to the people under Ninth Amendment to the United States Constitution.

71.     Further, a state license is imposed as a requirement for a religious act, namely the sacrament of marriage, and a state fee is collected for such right in violation of *Follett V. Town Of McCormick, S.C.* 321 U.S. 573, 64 S.Ct. 717, 152 A.L.R. 317, 88 L.Ed. 938 (1944), and *Murdock v. Commonwealth Of Pennsylvania and seven other cases*, 319 U.S. 105, 63 S.Ct. 870, 146 A.L.R. 81, 87 L.Ed. 1292 (1943).

72.   **WHEREFORE**, this court should declare Florida Statutes §741.01 to be unconstitutional, and null and void.

73.   Fla. Stats. §741.0305, especially but not limited to §741.0305(3)(a)(5) (taken alone or together with §496.404(19) incorporated within the text of §741.0305) creates excessive entanglement by putting religious officials under state supervision regarding the preparation of state pre-marital courses, and puts state officials in the position of judging the qualification of religious officials, thus inverting the federal constitution's ban on religious tests for public office by requiring a state test for the execution of religious offices and duties; this has the effect of establishing certain compliant churches as state-approved and others not.

74.   **WHEREFORE**, this court should declare Florida Statutes §§741.0305 and 496.404(19) to be unconstitutional, null, and void.

75.   Fla. Stats. §741.0306 gives the State of Florida, in particular acting with a quasi-governmental organization, The Florida Bar, excessive power with regard to the indoctrination and formulation of policy, and puts The Florida Bar in a position superior to religious institutions with regard to the preparation of pre-marital indoctrination and instruction; there is a conflict of interest because the members of The Florida Bar tend to profit more than anyone else from the application and implementation of these rules, to the detriment and discredit of legitimate religious officials who may or may not be licensed by the state pursuant to other provisions of law.

76.   **WHEREFORE**, this court should declare Florida Statutes §741.0306 to be unconstitutional, null, and void.

77.   Florida Statutes §741.07 states in full:

§ 741.07. Persons authorized to solemnize matrimony

(1) All regularly ordained ministers of the gospel or elders in communion with some church, or other ordained clergy, and all judicial officers, including retired judicial officers, clerks of the circuit courts, and notaries public of this state may solemnize the rights of matrimonial contract, under the regulations prescribed by law. Nothing in this section shall make invalid a marriage which was solemnized by any member of the clergy, or as otherwise provided by law prior to July 1, 1978.

(2) Any marriage which may be had and solemnized among the people called "Quakers," or "Friends," in the manner and form used or practiced in their societies, according to their rites and ceremonies, shall be good and valid in law; and wherever the words "minister" and "elder" are used in this chapter, they shall be held to include all of the persons connected with the Society of Friends, or Quakers, who perform or have charge of the marriage ceremony according to their rites and ceremonies.

78.     The establishment and entanglement problems created by these provisions of law are immense and obvious, and this court should declare Florida Statutes §741.07 to be unconstitutional, null, and void.

79.     The unconstitutional status of §741.07 is aggravated by its juxtaposition with §741.08, which states in full:

§741.08. Marriage    not    to    be    solemnized    without    a    license

Before any of the persons named in §741.07 shall solemnize any marriage, he or she shall require of the parties a marriage license issued according to the requirements of §741.01, and within 10 days after solemnizing the marriage he or she shall make a certificate thereof on the license, and shall transmit the same to the office of the county court judge or clerk of the circuit court from which it issued.

80.     **WHEREFORE**, this court should declare and adjudge that Florida Statutes §741.08 is unconstitutional, null, and void.

81.     Further, within the meaning and purpose of 42 U.S.C. §1988(a), Plaintiff moves and requests that this court will utilize its equitable powers of injunction, mandate, and prohibition to fashion and furnish suitable remedies where (after trial and hearing of all or

any of the issues in this case) it may appear that current law and procedures are not suitable to carry the constitutional purposes of the resolution of this lawsuit into effect:

> The jurisdiction in civil and criminal matters conferred on the district courts by the provisions of titles 13, 24, and 70 of the Revised Statutes for the protection of all persons in the United States in their civil rights, and for their vindication, shall be exercised and enforced in conformity with the laws of the United States, so far as such laws are suitable to carry the same into effect; but in all cases where they are not adapted to the object, or are deficient in the provisions necessary to furnish suitable remedies and punish offenses against law, the common law, as modified and changed by the constitution and statutes of the State wherein the court having jurisdiction of such civil or criminal cause is held, so far as the same is not inconsistent with the Constitution and laws of the United States, shall be extended to and govern the said courts in the trial and disposition of the cause, and, if it is of a criminal nature, in the infliction of punishment on the party found guilty.  **42 U.S.C. §1988(a).**

### Third Cause of Action: 42 U.S.C. §§1983, 1988
**Itemization of Florida Divorce Statutes Infringing upon the First Amendment Establishment of Religion, and Creating Excessive Entanglement between government and religious affairs within the scope of *Lemon v. Kurtzman* or infringing upon substantive and/or procedural due process by infringing upon fundamental rights.**

82.     Plaintiff realleges ¶¶1-74 of this Complaint and incorporates the material legal contentions and factual assertions and statements by reference as if fully copied and restated herein.

83.     Florida Statutes §61.011, entitled "Dissolution in Chancery," which states only that "Proceedings under this chapter are in chancery" is unconstitutional both facially and as applied, in that it creates a barrier to and burden on the enjoyment of the rights secured by the First, Fifth, Seventh, and Fourteenth Amendments to the United States Constitution.  Classifying dissolution proceedings as equitable, i.e. matters of chancery, violates these constitutional provisions because (1) it places the interests of public wealth and treasury (i.e. "chancery") above those expressly secured by the First Amendment to the constitution and given a preferential position in regard to other rights, (2) it denies the

legal due process rights of litigants in issues involving legal title to real and movable personal property by obliterating legal claims and granting excessive and unreasonable discretion to judges (who thus assume the position of Old English "Chancellors") to decide issues and questions which are primarily if not exclusively legal in nature, all in violation of the Fifth and Fourteenth Amendments, (3) §61.011 by assigning all dissolution proceedings to courts of chancery, deprives the litigants of their Seventh Amendment rights to a trial-by-jury in all cases arising at common (or statutory) exceeding $20 in value.

84.     Plaintiff Kathy Garcia-Lawson in particular submits that the assignment of dissolution actions as actions in equity rather than suits at law violates her fundamental right to trial-by-jury.

85.     In this country there has always been a strong presumption in favor of jury trials for resolving issues of fact in civil litigation. *Dimick v. Schiedt,* 293 U.S. 474, 485-86, 55 S. Ct. 296, 79 L. Ed. 603 (1935); *Beacon Theatres v. Westover,* 359 U.S. 500, 79 S. Ct. 948, 3 L. Ed. 2d 988 (1959).

86.     Plaintiff recognizes that the Seventh Amendment right to a jury trial is neither absolute nor rigidly applied. It must oftentimes yield to other considerations such as procedural innovations, *Parklane Hosiery v. Shore,* 439 U.S. 322, 99 S. Ct. 645, 58 L. Ed. 2d 552, 47 U.S.L.W. 4079 (1979), or the inability of jurors to understand and decide a case. *Ross v. Bernhard,* 396 U.S. 531, 538 n.10, 90 S. Ct. 733, 24 L. Ed. 2d 729 (1970).

87.     But none of these exceptions apply to suits for dissolution of marriage or the division of a marital estate, all of which matters arise from common or statutory law, nor

equity. Note, *The Right to a Jury Trial in Complex Civil Litigation,* 92 Harv. L. Rev. 898 (1979) (hereinafter cited as "Harvard Note").

88.     Central to the concept of a jury trial is the notion that litigants' rights will be adjudicated in a fair manner by impartial, capable fact finders representing a cross section of the community. To ensure fair and rational decisions, the right to trial by jury has been limited throughout history in two often-overlapping areas: cases arising under "equity" and cases which are extraordinarily complex. *In Re United States Financial Securities Litigation,* **75 F.R.D. 702, 708-09 (S.D. Cal. 1977)**; *Bernstein v. Universal Pictures, Inc.,* 79 F.R.D. 59, 67-68 (S.D.N.Y. 1978).

89.     But again, it is a constitutional infringement facially and deprivation of Kathy Garcia-Lawson's LEGAL rights that the Florida legislature arbitrarily defines dissolution as a matter arising in chancery, i.e., equity.

90.     In recent years, the Supreme Court has on several occasions addressed the scope of a litigant's Seventh Amendment rights, and in so doing has developed standards governing the right to trial by jury.

91.     Under the standard applicable to this case, the three-pronged test found in footnote ten of *Ross v. Bernhard, supra,* a district court must characterize each issue in the case before it as **legal** or equitable according to the following criteria: "first, the *pre-merger custom* with reference to such questions; second, the *remedy sought*; and third, the *practical abilities and limitations of juries.* " Id. at 538.

92.     According to this test, each and every **legal** issue is entitled to be tried before a jury, even in a divorce or dissolution case, as a matter of federally guaranteed rights, secured by the 7th Amendment and incorporated to the states through the 14th.  Although

there has been some debate with respect to the historical validity of this test, it has been generally adopted and applied by lower courts.  See Bernstein v. Universal Pictures, 79 FRD 59, 69 (SDNY 1978)(and cases cited therein; and Harvard Note at 904).

93.    **WHEREFORE**, this court should declare and adjudge that the legislative declaration that suits for dissolution of marriage (defined by law) are matters in chancery (i.e. actions in equity) is unconstitutional both on its face and as applied, for all of the above-and-foregoing reasons.

94.    Plaintiff Kathy Garcia-Lawson moves and requests that this court declare Florida Statutes §61.052 to be unconstitutional both on its face and as applied, as analyzed herein below:

> §61.052.  Dissolution of marriage.
> (1) No judgment of dissolution of marriage shall be granted unless one of the following facts appears, which shall be pleaded generally:
> (a) The marriage is irretrievably broken.

95.    Florida Statutes §61.052(1)(a) violates due process of law on its face by requiring facts to be generally rather than specifically pled and by allowing only one defense, and violates due process of law as applied in the Courts of the State of Florida because in fact the defense of "not irretrievably broken[6]" is never allowed to win as a matter of custom, practice, and policy which is unconstitutional.

---

[6] Although there is, perhaps, no constitutional right to any express statutory definition of terms used in the statutes, Kathy Garcia-Lawson maintains that the phrase "irretrievably broken" is nowhere defined in the list of 21 definitions provided in Florida Statutes §61.046 (2008) which defines such commonly understood terms as "Business Day", "Income", and "Support" on the one hand, and such specifically specialized terms and phrases relating to the 42 U.S.C. §§651 et seq. violations of the Tenth Amendment as "State Case Registry", "Federal Case Registry of Child Support Orders", "State Disbursement Unit", and "National Medical Support Notice."  Despite the findings and holdings of **Ryan v. Ryan**, and because of the unconstitutional customs, practices, and policies implementing Florida dissolution law over the 35 years SINCE the decision of **Ryan v. Ryan**, Plaintiff Kathy Ann Garcia-Lawson proposes that it is now time to revisit

96.     Florida Statutes §61.052(2) violates due process of law on its face by allowing uncorroborated proof to establish key facts necessary to prevail in any dissolution case and in §61.052(2)(b)(1) creates an impermissible entanglement between government and religion when it again (as described in the Second Cause of Action above) places the courts in the position of judging the qualification of religious practitioners or officers and thus violates both the First and Fifth Amendments to the U.S. Constitution, as well as violations of the Ninth Amendment by curtailing unenumerated rights of the people, depriving them of their liberty without due process of law.

97.     Furthermore, as applied, the courts of the state of Florida, or at least the 15th Judicial Circuit in Palm Beach County, never actually allow the petitioner's unilateral plea of irretrievably broken to be defeated or rebutted (despite statutory language to the contrary, suggesting, in effect, this is a "sham" possibility):

> (2) Based on the evidence at the hearing, which evidence need not be corroborated except to establish that the residence requirements of §61.021 are met which may be corroborated by a valid Florida driver's license, a Florida voter's registration card, a valid Florida identification card issued under §322.051, or the testimony or affidavit of a third party, the court shall dispose of the petition for dissolution of marriage when the petition is based on the allegation that the marriage is irretrievably broken as follows:
>
> (a) If there is no minor child of the marriage and if the responding party does not, by answer to the petition for dissolution, deny that the marriage is irretrievably broken, the court shall enter a judgment of dissolution of the marriage if the court finds that the marriage is irretrievably broken.
>
> (b) When there is a minor child of the marriage, or when the responding party denies by answer to the petition for dissolution that the marriage is irretrievably broken, the court may:
>
> 1. Order either or both parties to consult with a marriage counselor, psychologist, psychiatrist, minister, priest, rabbi, or any other person deemed qualified by the court and acceptable to the party or parties ordered to seek

the "void for vagueness" challenge to the "irretrievably broken" standard of divorce, especially in light of the allegations of this complaint.

consultation;                                                                              or

    2. Continue the proceedings for a reasonable length of time not to exceed 3 months, to enable the parties themselves to effect a reconciliation; or

    3. Take such other action as may be in the best interest of the parties and the minor child of the marriage.

If, at any time, the court finds that the marriage is irretrievably broken, the court shall enter a judgment of dissolution of the marriage. If the court finds that the marriage is not irretrievably broken, it shall deny the petition for dissolution of marriage.

(3) During any period of continuance, the court may make appropriate orders for the support and alimony of the parties; the primary residence, custody, rotating custody, visitation, support, maintenance, and education of the minor child of the marriage; attorney's fees; and the preservation of the property of the parties.

(4) A judgment of dissolution of marriage shall result in each spouse having the status of being single and unmarried. No judgment of dissolution of marriage renders the child of the marriage a child born out of wedlock.

(5) The court may enforce an antenuptial agreement to arbitrate a dispute in accordance with the law and tradition chosen by the parties.

(6) Any injunction for protection against domestic violence arising out of the dissolution of marriage proceeding shall be issued as a separate order in compliance with chapter 741 and shall not be included in the judgment of dissolution of marriage.

(7) In the initial pleading for a dissolution of marriage as a separate attachment to the pleading, each party is required to provide his or her social security number and the full names and social security numbers of each of the minor children of the marriage.

(8) Pursuant to the federal Personal Responsibility and Work Opportunity Reconciliation Act of 1996, each party is required to provide his or her social security number in accordance with this section. Each party is also required to provide the full name, date of birth, and social security number for each minor child of the marriage. Disclosure of social security numbers obtained through this requirement shall be limited to the purpose of administration of the Title IV-D program for child support enforcement.

98.     Finally, §61.052(8) of the Florida Statutes violates the Ninth and Tenth Amendment to the Constitution by creating a position of dependency of a fundamental right on compliance with a voluntary Federal Systems of Social Security and Welfare; the State of Florida has surrendered part of its sovereignty in the interests of compliance with Social Security and Welfare and subordinates the welfare of its children to Federal Title IV-D welfare programs without the consent of the parties involved, despite the fact that the Federal Social Security and Welfare programs are entirely voluntary BUT FOR state action such as this statutory provision, which (like marriage licensing and no-fault divorce) has been insidiously foisted upon the people of Florida by dishonest or inattentive legislators not concerned with their constituents' fundamental rights. In short, the Florida legislature has piled yet more contracts of adhesion on the marital relationship by its subservient surrender of state sovereignty in exchange for federal welfare dollars.

99.     The people of Florida had no say in this. There was no public debate, and the effect is catastrophic in that the fundamental freedom of individuals to contract, i.e. to arrange their own private lives and affairs consistent with their religious beliefs and/or personal philosophy, has been obliterated, almost *in toto*, with regard precisely to those aspects of private and family life, "the intimacies of the marital relationship" which the Supreme Court has declared MOST subject to privacy protection---but only insofar as rights to abortion, contraception, sodomy, and non-sacramental forms of marriage are concerned.

100.    Furthermore, like the marriage license, no fault divorce through §61.052 constitutes and implements provisions of the illegal, unconscionable, and unconstitutionally state-drafted and imposed contract of adhesion, which makes almost

nugatory §61.052(4) which purports to provide limited respect to an antenuptial agreement, when, as a matter of common law, the ONLY aspect of any marriage relationship which was or should be subject to state jurisdiction is the expressly written marital contract agreed by the parties and executed according to the formalities of the old English Statute of Frauds.

101.   **WHEREFORE**, Plaintiff Kathy Garcia-Lawson prays that this court should declare and adjudge that §61.052 of the Florida Statutes is unconstitutional and void, both on its face and as applied, as violative of the First, Fifth, Ninth, Tenth, and Fourteenth Amendments to the U.S. Constitution.

102.   Finally, Plaintiff prays that the Court will find §61.044 ("The defenses to divorce and legal separation of condonation, collusion, recrimination, and laches are abolished) of the Florida Statutes unconstitutional as abolishing certain legal defenses (consistent with the transfer of dissolution litigation to the chancery) thus depriving the dissolution lawsuit of its legal character and the individual litigant, such as Plaintiff, of her legal rights in connection with the legal action for breach of the marital contract.

103.   **WHEREFORE,** Plaintiff prays that this court will declare §61.044 of the Florida Statutes to be unconstitutional and null and void both on its face and as applied.

104.   Furthermore, within the meaning and purpose of 42 U.S.C. §1988(a), Plaintiff moves and requests that this court will utilize its equitable powers of injunction, mandate, and prohibition to fashion and furnish suitable remedies where (after trial and hearing of all or any of the issues in this case) it may appear that current law and procedures are not suitable to carry the constitutional purposes of the resolution of this lawsuit into effect:

> The jurisdiction in civil and criminal matters conferred on the district courts
> by the provisions of titles 13, 24, and 70 of the Revised Statutes for the

protection of all persons in the United States in their civil rights, and for their vindication, shall be exercised and enforced in conformity with the laws of the United States, so far as such laws are suitable to carry the same into effect; but in all cases where they are not adapted to the object, or are deficient in the provisions necessary to furnish suitable remedies and punish offenses against law, the common law, as modified and changed by the constitution and statutes of the State wherein the court having jurisdiction of such civil or criminal cause is held, so far as the same is not inconsistent with the Constitution and laws of the United States, shall be extended to and govern the said courts in the trial and disposition of the cause, and, if it is of a criminal nature, in the infliction of punishment on the party found guilty.

**42 U.S.C. §1988(a).**

105.    Plaintiff Kathy Garcia-Lawson prays for all her legal damages for the above-and-foregoing violations of her civil rights by and through these unconstitutional statutes of the State of Florida in the amount of $250,000.00, plus pre-and-post judgment interest, plus punitive and exemplary damages that are allowed by 42 U.S.C. §§1983 and 1988, even though the United States Supreme Court has declared that proven violations of due process rights are entitled at least to nominal damages, even when no actual damages can be proven.  **Carey v. Piphus,** 435 U.S. 247, 98 S. Ct. 1042, 55 L. Ed. 2d 252, 1978 U.S. LEXIS 69 (1978), see also, **Farrar v. Hobby**, 506 U.S. 103, 113 S. Ct. 566, 121 L. Ed. 2d 494, 1992 U.S. LEXIS 7846, 61 U.S.L.W. 4033, 6 Fla. L. Weekly Fed. S 787, 92 Cal. Daily Op. Service 9968, 92 D.A.R. 16669 (1992), and also **Hughes v. Rowe,** 449 U.S. 5, 101 S. Ct. 173, 66 L. Ed. 2d 163, 1980 U.S. LEXIS 1, 49 U.S.L.W. 3346 (1980).

## **Fourth Cause of Action: Florida Constitutional Issues**

106.    Plaintiff re-alleges ¶¶1-105 and incorporates all the material allegations and legal contentions of the same as if fully copied and restated herein below.

107.    Kathy Garcia-Lawson alleges that the Florida statutes of marriage and divorce described above generally deny or infringe upon her basic rights as described by Article I,§2 of the Florida Constitution:

> All natural persons, female and male alike, are equal before the law and have inalienable rights, among which are the right to enjoy and defend life and liberty, to pursue happiness, to be rewarded for industry, and to acquire, possess and protect property. No person shall be deprived of any right because of race, religion, national origin, or physical disability.

108.    It is unquestionable that the Courts of the 15th Judicial Circuit under colour of the marital and divorce laws of the state of Florida have denied Kathy Garcia-Lawson her liberty interests and rights to pursue happiness and to acquire, possess, and defend property on the grounds of her religion, on the one hand, and her status as a respondent in a divorce action on the other, all in violation of Article I,§2.

109.    Kathy Garcia-Lawson, under the Florida dissolution procedures on their face and/or as implemented, cannot even raise her religion as a defense to "no fault" divorce, or assert that her right to the pursuit of happiness is directly dependent upon her right to keep her marriage intact pursuant to her religion.

110.    The Florida Supreme Court stated in 1973, in the *Ryan v. Ryan* opinion cited *supra*:

> **We do not view the matter of dissolution as being such a simple, unilateral matter of one mate simply saying, "I want out."** All of the surrounding facts and circumstances are to be inquired into to arrive at the conclusion as to whether or not indeed the marriage has reached the terminal stage based upon facts which must be shown. **Even in uncontested dissolutions, the court would properly make inquiry to determine this fact, for the statute itself § 61.052 provides in subsection (2) the basic predicate: "Based on the evidence at the hearing....[and even] (a)...if the respondent does not...deny that the marriage is irretrievably broken, the court shall enter a judgment of dissolution of the marriage, if the court finds that the marriage is irretrievably broken."** (bold emphasis added).

111.   To the degree that the Florida Supreme Court was articulating the constitutional law of the State of Florida, Plaintiff now alleges that the actual custom, practice, and policy of the law of marital dissolution as applied in Florida violates both the letter and spirit of *Ryan v. Ryan* and the State Constitutional underpinning therefore.

112.   Article I, §3, of the Florida Constitution on "Religious Freedom" states:

> There shall be no law respecting the establishment of religion or prohibiting or penalizing the free exercise thereof. Religious freedom shall not justify practices inconsistent with public morals, peace or safety. No revenue of the state or any political subdivision or agency thereof shall ever be taken from the public treasury directly or indirectly in aid of any church, sect, or religious denomination or in aid of any sectarian institution.

113.   Plaintiff alleges and asks this court to declare and adjudge that the divorce laws of Florida cited above offend the first clause (sentence/sub-section) of Article I, §3 in that no fault divorce prohibits and penalizes Kathy Garcia-Lawson in the free exercise of her religious beliefs by forcing her to perform sacrilegious acts in connection with divorce, as well as the divorce process, including acceptance of pre-requisites such as mediation and forcing her to admit as true things that she knows to be untrue to her beliefs and further forcing her to inflict injury on her daughter by accepting divorce.

114.   These violations and burdens on Kathy Garcia-Lawson's religious freedom are all actionable under §761.03 of the Florida Statutes as well as 42 U.S.C. §§1983, 1988.

115.   Furthermore, Kathy Garcia-Lawson's rights under Article I, §3 are offended by the marriage laws of Florida which required her to accept the above-described contract of adhesion as an implicit, but undisclosed, precondition to her marriage.

116.   And still further, Kathy Garcia-Lawson alleges that the Florida marriage laws cited above violate the prohibition in the third clause (sentence/subsection) of Article I,§3, by requiring public moneys to be spent on religious purposes (and religious funds to

be expended on public purposes) by the excessive entanglement imposed and required by Florida statutory law between religious institutions and religious practitioners as agents charged with implementing various state counseling and solemnization of marriage programs.

117.   **WHEREFORE**, Plaintiff moves and requests that this court declare unconstitutional, null, and void, all the enumerated and challenged sections of the Florida Statutes relating to Marriage and Dissolution of Marriage as violative of Florida Constitution Article I, §3, and assess Plaintiff's reasonable damages directly caused by these unconstitutional statutes to be paid by and from the public treasury.

118.   Article I, §5 of the Florida Constitution states:

> The people shall have the right peaceably to assemble, to instruct their representatives, and to petition for redress of grievances.

119.   Natalie M. Garland has conspired with Judge Oftedahl and Judge Colbath to deprive Plaintiff Kathy Garcia-Lawson of this specific right, more than all others, without federally guaranteed due process of law under the 5th and 14th Amendment and so in violation of 42 U.S.C. §§1985 and 1986 (in that, as noted above, neither officer of the court with the power to prevent this abuse, acted to prevent such shameful and officially oppressive acts).

120.   Plaintiff Kathy Garcia-Lawson alleges and asks this court to declare and adjudge the limitations on pleadings in divorce cases contained in Florida Statutes Chapter 61, especially when combined with the language already quoted regarding religious freedom, namely:

> There shall be no law respecting the establishment of religion or prohibiting or penalizing the free exercise thereof. Religious freedom shall not justify practices inconsistent with public morals, peace or safety. No revenue of the

> state or any political subdivision or agency thereof shall ever be taken from the public treasury directly or indirectly in aid of any church, sect, or religious denomination or in aid of any sectarian institution.

prohibit her from exercising her right to petition for redress of grievances, infringing upon, and inflicting non-trivial, more than nominal or "per se" injuries on her by wrongfully, and willfully curtailing her rights under Article I, §5, in that Plaintiff's ability to file answers, affirmative defenses, and counterclaims in divorce court is expressly limited by law, thereby infringing upon Plaintiff's fundamental liberty arising from the private marital relationship, all actionable as violations of Florida Statutes §761.03 as well as 42 U.S.C. §§1983, 1988.

121.    Because of the limited scope of pleading and presentation of facts allowed in divorce cases as administered ministerially (i.e., without individualized thought or reflection) on the part of judges in the Fifteenth Judicial Circuit as a matter of local-or-statewide custom, practice, and policy, Kathy Garcia-Lawson alleges that her right to petition for redress of grievances is severely hindered, either by the law as stated on its face or as applied in the 15th Judicial Circuit in and for Palm Beach County or both, and that these burdens upon her liberty are actionable as violations of Florida Statutes §761.03 as well as 42 U.S.C.§§1983, 1988.

122.    **WHEREFORE,** Plaintiff moves and requests that this court declare and adjudge that the limitations on pleading in divorce cases expressly set forth and contained in Florida Statutes Chapter 61 deny or limit her right to petition for redress of grievances, infringing upon, and inflicting non-trivial injuries on her in violation of the Florida Constitution Article I,§5, and that the customs, practices, and policies of the 15th Judicial Circuit Court in and for Palm Beach County, Florida, further deny her these rights to a

greater and more injurious degree, all in violation of law and fully actionable under the Florida Civil Rights Acts including but not limited to §761.03.

123.   It would have been vain and futile to make a pre-filing demand on the Florida authorities prior to filing this suit, because Kathy Garcia-Lawson did indeed attempt to lodge her complaint with two successive judges of the 15th Judicial Circuit who both failed and refused to honor her attempts to amend her pleading to raise precisely the same constitutional issues in her still-pending divorce action in the 15th Judicial Circuit as she now raises in this separate civil action for declaratory judgment.

124.   Plaintiff Kathy Garcia-Lawson further alleges that the marital and dissolution statutes complained of above as a matter of Federal law also violate Article I, §10 of the Florida Constitution forbidding legislative or statutory impairment of contract:

> **Article I, §10: Prohibited laws**
> **No bill of attainder, ex post facto law or law impairing the obligation of contracts shall be passed.**

125.   The status of Florida marriage as a contract formed privately in the implementation of fundamental rights has already been mentioned.

126.   Plaintiff Kathy Garcia-Lawson proposes that the ONLY legitimate state involvement in marital contracts would be to enforce expressly written and voluntarily entered agreements, executed according to the formalities of the Statute of Frauds, and that the State of Florida should never impose any contract of adhesion on any marital couple at all as a matter of religious freedom, privacy, the right to acquire, maintain, and preserve property, and all other basic and fundamental rights secured by the Florida and United States Constitutions.

127. **WHEREFORE**, Kathy Garcia-Lawson asks this court to declare and adjudge that all statutes relating to secular matrimony (what a contradiction in terms!) and dissolution be declared unconstitutional as violating the Florida Constitution's prohibition on statutory/legislative impairment of contracts.

128. Kathy Garcia-Lawson further asks that this court declare and adjudge that the constructions placed on the Federal Constitution's guarantee against State impairment of contract have been too narrow and are themselves unconstitutional as abridging and infringing upon the original intent of Article I,§10(1).

129. Kathy Garcia-Lawson alleges that Judges Colbath and Oftedal have specifically violated the open courts provision of the Florida Constitution by impeding her in her ability to raise effective, necessary, and proper defenses to the divorce proceeding brought by Jeffrey Lawson, specifically:

> **§ 21. Access to courts**
> **The courts shall be open to every person for redress of any injury, and justice shall be administered without sale, denial or delay.**

130. The Judges of the Fifteenth Judicial Circuit have recklessly, wantonly, or intentionally denied Kathy Garcia-Lawson of her rights to access to the courts for redress of the specific constitutional injuries raised in this present lawsuit and complaint.

131. **WHEREFORE**, these Judges Colbath and Oftedal have acted clearly in excess of their jurisdiction and have thereby waived all claims to judicial immunity.

132. **WHEREFORE**, Kathy Garcia-Lawson now sues Judges Colbath and Oftedal in their official capacities for conduct clearly in excess of their jurisdiction within the meaning of 42 U.S.C. §§1983, 1988, and 1996 USCCAN 4216-4217.

133.   **WHEREFORE**, Kathy Garcia-Lawson now sues Judges Colbath and Oftedal in the amount of $500,000.00 for which they are jointly and severally liable.

134.   As already noted above, in relation to the Federal Constitutional guarantee of right to trial-by-jury, the Chapter §61.011 of the Florida Statutes which classifies dissolution proceedings as matters in chancery and thereby places them under rules of equity is unconstitutional.

135.   Supplementing the Federally guaranteed right enshrined in the 7th Amendment and extended to the States by the 14th, The Florida Constitution specifically provides:

> **§ 22.  Trial by jury**
> **The right of trial by jury shall be secure to all and remain inviolate. The qualifications and the number of jurors, not fewer than six, shall be fixed by law.**

136.   Chapter §61.011 must therefore be declared unconstitutional, null, and void pursuant to Article I,§22 of the Florida Constitution's Declaration of Rights.

137.   Finally, while the federal constitutional guarantee of privacy has been described as "penumbral" arising from a constellation of rights implicit but not enumerated in the First, Second, Third, Fourth, Fifth, and Ninth Amendments, integrated and incorporated to the States through the 14th, the Florida Constitution expressly and explicitly provides:

> **§ 23.  Right of privacy**
> **Every natural person has the right to be let alone and free from governmental intrusion into the person's private life except as otherwise provided herein. This section shall not be construed to limit the public's right of access to public records and meetings as provided by law.**

138.   NOTHING, "provided herein" in the Florida Constitution authorizes the invasions of privacy mandated by the unconstitutional statutes relating to divorce and marriage and implemented by the courts of the Fifteenth Judicial Circuit and throughout Florida.

139.    WHEREFORE, all of the above-enumerated provisions of the marital statutes and laws relating to dissolution of marriage, as well as the customs, practices, and policies of the courts, judges, court-clerks, and social-workers implemented thereunder, MUST NOW BE DECLARED UNCONSTITUTIONAL, NULL, AND VOID under and pursuant to Article I, §23 of the Florida Constitution, regardless of the interpretation of the right to privacy as a matter of Federal Law, although Plaintiff would contend, as she has throughout this complaint, that in fact all substantive due process law enunciated by the U.S. Supreme Court in fact does create an absolute right of privacy.

## FIFTH CAUSE OF ACTION: FEDERAL INVASION OF STATE MARITAL & DISSOLUTION LAW UNDER COLOUR OF PUBLIC WELFARE TITLE 42(IV-D)

140.    Plaintiff Kathy Garcia-Lawson incorporates ¶¶1-139 of this her Original Complaint and incorporates the same by reference as if fully copied and restated herein.

141.    Plaintiff herein alleges, as shown and illustrated by, among other things, many of the definitions cited above in Florida Statutes §61.046, that dissolution and child custody law in Florida are in fact entirely controlled, mandated, and therefore pre-empted by Federal Law, to wit, Title 42 U.S.C. §§ 651, et seq., Title 42 U.S.C. §§1301 et seq., and Title 45 C.F.R. §301.1 et seq., especially but not limited to §303.11, which federal statutes and regulation, taken together completely "occupy the entire field" and pursuant to the Supremacy Clause of the United States Constitution, control the interpretation and implementation of Federal law by the State, all imposed on the States in a manner and to a degree violating the letter and spirit of both the Ninth and Tenth Amendments to the Constitutions.

142.   In effect, these above-cited Florida statutes and regulations imposed pursuant thereto, as well as the implementation of these statutes and regulations imposed by the Florida State Judiciary, completely "federalize" child support law in Florida, as shown by the utilization of federal terms and classificatory designations otherwise UNKNOWN to the Florida Marital and Divorce Statutes such as "Noncustodial Parent" and "Custodial Parent" (included in Fla. Stats. §61.046 as definitions but almost nowhere else), which are categories neither established, defined, nor even in any sense consistent with the Florida Statutes otherwise.

143.   Certain United States Courts have previously recognized the close, indeed intimate, relationships between State Family Law and the Social Security Act, but Plaintiff alleges that these cases were wrongly decided, without regard to the 9th and 10th Amendment rights reserved to the states and the people thereof, and that this Florida Court should hold all merger of state family and domestic relations law and federal public health and welfare law to be null and void as unconstitutional burdens, violative of and infringing upon fundamental civil rights of both parents and children.   Cf., e.g.. *O'Donnell v. McCollum*, 393 F.Supp.2d 508, (W.D. Tex., 2005)(September 30, 2005). aff'd *O'Donnell v. McCollum*, 481 F.3d 280 (C.A.5 [Tex.], 2007)(March 09, 2007).

144.   Plaintiff Kathy Garcia-Lawson charges that, because the State of Florida, especially acting by and through Robert A. Butterworth acting as Florida's Secretary of the Department of Children & Families, seeks unconstitutionally and illegally to expand his role as "the state's Title IV-D agency", he engages in "Artful Pleading" to disguise the true federal nature of all domestic relations, family, and marital law.

145.     Plaintiff Kathy Garcia-Lawson files this complaint for declaratory judgment in part for the purpose of challenging all the child support provisions of the Family Statutes, and all related and affected regulations and judicial customs, practices, and policies affected or controlled by Florida Statutes, as far in excess of what is actually authorized either by Federal Law or the Federal Constitution or the statutes admitting Florida (and other states) to the Union, which do not provide for a waiver of Ninth and Tenth Amendment rights or the ultimate sovereignty of the state or the people.

146.     The authority of the State Attorney General and Secretary of DCF to appear and intervene in Florida dissolution and post-dissolution proceedings with support complaints and related documents expressly depend on a number of issues of federal law contained throughout Subchapter A "Administration of Title IV-D Program".

147.     Plaintiff Kathy Garcia-Lawson alleges that the definitions provided in Florida Statutes §61.043 determine the manner in which the state assesses child welfare in a uniquely Federal manner, and that all hearings conducted there-under in State Court do not serve the enforcement of honestly decided and enacted state law but rather serve the Title 42 (IV-D) redistributive purposes whereby the United States has sought to compete with the socialist world by raising revenue for the state for the implementation of public health and welfare programs.

148.     Finally, Plaintiff Kathy Garcia-Lawon alleges, in violation of 42 U.S.C. §1981, that the customs, practices, and policies of the Florida Attorney General and Secretary of the Department of Children and Families in Palm Beach County and many other counties in the State of Florida, infringe upon the Plaintiff's equal rights to make and enforce contracts and to enforcement of her other rights to sue, give evidence, and to the full and

equal benefit of all laws and proceedings for the security of persons and property on grounds of an illegal and unconstitutional (not to mention irrationally inaccurate) and discriminatory classifications which serve no rational purpose consistent with the Florida or United States Constitutions.

149.    **WHEREFORE**, Plaintiff asks that this Court declare and adjudge that all relevant provisions of the Florida Marital and Dissolution Statutes which refer to Title 42 (IV-D) be declared unconstitutional, and therefore null and void, as violative of the principles of State sovereignty and reservation to the people of all unenumerated rights in violation of the Ninth and Tenth Amendments to the U.S. Constitution.

<div align="center">

**COUNT VI: ADMINISTRATIVE PROCEDURE ACT or
DECLARATORY JUDGMENT UNDER _BIVENS_ FOR PROSPECTIVE RELIEF**

</div>

150.    Plaintiff Kathy Garcia-Lawson re-alleges paragraphs 1-149 of this her First Original Complaint.

151.    THE SECRETARY OF HEALTH & HUMAN SERVICES HAS BEEN DERELICT IN HIS DUTY TO SUPERVISE HIS AGENTS/REPRESENTATIVES IN FLORIDA, especially the Florida Attorneys General and the Offices of the Florida Attorney General and the Department of Children & Family Services in particular.

152.    Michael O. Leavitt is the United States Secretary of Health & Human Services, charged by law with the supervision and proper enforcement of the Social Security and Welfare Programs under Title 42.

153.    **This Court has jurisdiction pursuant to 5 U.S.C. §701-706, 15 U.S.C. §§1-15, 28 U.S.C. §§1331, 1343, and 1346, and for declaratory judgment regarding constitutional matters under _Bivens_ and 28 U.S.C. §§2201-2202.**

154.     For cause of action against Michael O. Leavitt, the Secretary of Health & Human
Services, Kathy Garcia-Lawson sues pursuant to 5 U.S.C. §§702 and 706(1).

155.     Kathy Garcia-Lawson alleges that the Secretary of Health & Human Services,
under Title 42 U.S.C. generally, is the de-facto and de-jure administrator of a nationwide
program which controls or seeks to establish policies controlling the organization,
property holdings, and welfare of families nationwide under the guise of a program of
Federal Welfare Services implemented through the states, and that this program is the
guiding "loadstar" of state family law enforcement in Florida and elsewhere, so that the
purpose and motivation of family law courts and judges is to destroy families and to
make children dependent wards of the state, advancing the Soviet Communistic programs
described elsewhere in this complaint, foisted without democratic decision, knowledge,
or consent, on a somnambulant American population increasingly addicted to
government handouts.

156.     Both the present and former attorney general named as Defendants in this case,
and the recently resigned Secretary of the Florida Department of Children & Family
Services, in his capacity as the State's Title IV-D (federal) agent, as he is designated
pursuant to both Florida and Federal law, both acting in concert with the Secretary of
Health and Human Services, failed and refused to honor his obligations to make certain
that the programs he administers on behalf of the Federal Government conform both with
the letter of the controlling statutes and the constitutional limits on the exercise of Federal
power, and the limits on governmental power generally imposed by the Bill of Rights and
the 14th Amendment.

157.   These failures or refusals take the form of a gross and long-standing de facto HHS custom, practice, and policy having the force of law, and should be deemed by this court to amount to final agency action within the meaning of 5 U.S.C. §704 in that there was no agency procedure or higher level action open to the Plaintiff, nor is there any other adequate remedy in any court and the HHS' denial of Plaintiff's request is therefore subject to judicial review.

158.   Plaintiff Kathy Garcia-Lawson has been injured by HHS's refusal to honor its obligation to restrain the constitutional and lawful implementation of Florida's Title IV-D program, or even to investigate the mishandling and misappropriation of power by the Office of the Attorney General as the Secretary of HHS' Title IV-D agent, in that Kathy Garcia-Lawson has been pressured into a divorce along with threatened loss of private property through governmental regulatory mandate (amounting, as a practical matter, to coercion or duress) to divorce, and therefore exposed to liability (and potential loss of liberty or property rights, taken without due process of law) pursuant to wrongful, malicious prosecution undertaken in part as a result of the State of Florida's implementation of Title IV-D customs, practices, and policies relating to marriage and child-rearing without legal authority, justification, or any basis in fact.

159.   Pursuant to Title 42, the Secretary of Health & Human Services has a duty to examine and review the state agents' compliance with Federal law in the administration of Title IV-D welfare programs, including but not limited to child welfare enforcement programs and their impact on the family, both as a statistical concept and as regards individual family circumstances.

160.    Plaintiff Kathy Garcia-Lawson alleges and will show that the Secretary of Health and Human Services has ignored and is in complete derogation of his duty to enforce the Federal statutory and constitutional standards in the application of Title IV-D programs within the State of Florida.

161.    **Such a violation of rights in pursuit of official power aggrandizement by state officials is the sort of injury that Title IV-D was designed to prevent, and which the Secretary of Health and Human Services is charged with investigating or punishing.**

162.    **Accordingly, Kathy Garcia-Lawson alleges and here complains that she has been adversely affected or aggrieved by agency action (or refusal to act) within the meaning of the relevant (Title IV-D) statute, and is therefore entitled to judicial review thereof.**

163.    **Specifically, Kathy Garcia Lawson seeks a judicial a judicial order or declaration to compel agency action unlawfully withheld or unreasonably delayed, within the meaning of 5 U.S.C. §706(1).**

164.    **WHEREFORE, Kathy Garcia Lawson prays that this court, pursuant to 5 U.S.C. §706:**

> **(1) compel agency action unlawfully withheld or unreasonably delayed; and**
>
> **(2)  hold unlawful and set aside agency action, findings, and conclusions found to be—**
>
> > **(a) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;**
> >
> > **(b) contrary to constitutional right, power, privilege, or immunity;**

(c) in excess of statutory jurisdiction, authority, or limitations, or

short of statutory right;

(d) without observance of procedure required by law;

(e) unsupported by substantial evidence in a case subject to sections

556 and 557 of this title or otherwise reviewed on the record of an

agency hearing provided by statute; or

(f) unwarranted by the facts to the extent that the facts are subject to

trial de novo by the reviewing court;

(g) grant all such other and further relief as may be necessary to

effectuate the intent of Congress in enacting Title IV-D, as a

subsection of Title 42 of the United States Code.

165.    To the degree that this action against Secretary Michael O. Leavitt should be

construed as an action for violation of civil rights against a Federal Official charged

with the enforcement thereof, Kathy Garcia Lawson asks that the Court treat this

Complaint as a "Bivens" action for prospective declaratory and injunctive relief

only, in that Plaintiff seeks no damages to be paid out of the U.S. Treasury, but only

an indictment of the design and intent of HHS policy, a declaratory judgment

regarding Title IV and its impact on the 1st and 9th Amendments, and a vindication

of her own rights under those provisions.

166.    Plaintiff Kathy Garcia-Lawson finally prays that the court will enter all such

other and further supplementary relief, including supervisory relief over the

enforcement of its order in Plaintiff's favor in this case, in addition to full

declaratory and injunctive relief, and all such other and further relief to which the Court may find the Plaintiff justly entitled at law or in equity.

167.    Plaintiff moves for an award of her costs (and attorneys' fees, if any are incurred) as allowed by law.

## JURY DEMAND

Plaintiff Kathy Garcia-Lawson demands a trial-by-jury of all issues so triable by a jury of 12 competent citizens, including all issues of fact and all mixed questions of fact and law underlying any question of legal or constitutional interpretation, including the liability of public officials for constitutional damages incurred by the violation of well-established law.  Further, Kathy Garcia-Lawson moves and requests that the Court empanel and authorize the same jury of 12 citizens to sit as an advisory jury so as to evaluate and comment upon all questions of law, to recommend decisions, resolutions, and remedies on all questions of law and public policy.

## PRAYER FOR RELIEF

(1)    Plaintiff asks, moves, and requests that this court serve notice and summons upon all defendants, requiring them to appear and answer the above-and-foregoing complaint, and to show cause why the declaratory relief requested should not be granted as to all legal and constitutional questions, or in the alternative;

(2)    Plaintiff asks, moves, and requests that this Court order defendants to show by what lawful and constitutional authority these defendants violate the Plaintiff's legal and constitutional rights, and that the court in this connection find and rule that Judges

Richard Oftedal and Jeffrey Colbath have acted clearly in excess of their jurisdiction, and pursuant to 42 U.S.C. §1988(b) are therefore liable for their constitutional torts and all personal injuries flowing there-from, including indirect or psychological injuries to the minor child of the Plaintiff herein, including but not limited to the cost of psychological evaluation and treatment.

(3)     Plaintiff asks, moves, and requests that this court assess her actual damages in the minimum amount of $500,000.00 for the burdens imposed on her in the exercise, for the infringements and other violations of her basic, civil, and fundamental constitutional rights, and that the court impose further damages in at least trebled the amount of her actual damages to serve as punitive and exemplary damages to all persons similarly situated who might be tempted to infringe upon the rights of other Plaintiffs, similarly situated as respondents in divorce proceedings or otherwise.

(4)     Plaintiff asks, moves, and requests, pursuant to 42 U.S.C. §1988(a), that this court entertain argument and consider crafting novel and innovative remedies to resolve the constitutional injuries hereinabove described.

(5)     Plaintiff asks, moves, and requests, pursuant to the First, Ninth, and Fourteenth Amendments to the United States Constitution, and also pursuant to Florida Statutes §761.03, that this court put an end to the oppressive burdens on religious freedom in Florida imposed by the Florida Statutes relating to licensing of marriage, dissolution of marriage, and all issues relating to state control over children and child custody, utilizing all its constitutional, equitable, and legal powers to achieve this end, and

(6)     Plaintiff asks that the Court restore the rule and right to freely contract for marriage, and restore to the juries of Florida the right and power to decide all questions of fact and mixed questions of fact and law arising when a marital contract is breached.

(7)     Plaintiff asks, moves, and requests this court to declare unconstitutional all provisions of the Florida Statutes challenged herein under provisions of either the U.S. or Florida constitutions, and to instruct the legislature of the state of Florida regarding what remedial steps or redress of injuries may be required of the state for the misconduct of countless judges, two recent attorneys general, and many other state and county clerks and other officials.

(8)     Plaintiff further asks that the Court resolve the excessive entanglement of the United States Department of Health & Human Services, acting by and through the purported authority of Title IV-D of Title 42 of the U.S. Code, to set and regulate Family law and policies relating to marriage in the State of Florida, and to require the Secretary of Health and Human Services to reform the practical implementation of Title IV-D welfare programs to respect the autonomy of the individual and the family within the meaning of the First, Ninth, and Fourteenth Amendments to the Constitution, as well as within the meaning of **Lemon v. Kurtzman** and subsequent cases construing state involvement with sacramental acts such as marriage, baptism (e.g. naming and identity), and the welfare (i.e. education and residence) of the children affected by unwarranted and illegal government regulation of these matters.

(9)     Finally, Plaintiff asks, moves, and requests all such other and further relief to which this court may find her justly entitled as a matter of constitutional or statutory law or as a matter of equity.

Respectfully submitted,

On this 5th day of August, 2008

*Kathy A. Garcia Lawson*

Kathy Ann Garcia-Lawson, Plaintiff
in propia persona

2620 Natures Way
Palm Beach Gardens, FL 33410
561-624-8725

# LIST OF EXHIBITS

**EXHIBIT A:**
Affidavit of Judy Parejko (as an expert witness)

**EXHIBIT B:**
Brief History of Florida's No-Fault Divorce Law & the Uniform Marriage and Divorce Act (UMDA)  [prepared by Judy Parejko]

**EXHIBIT C:**
Affidavit of Kathy Garcia-Lawson on Palm Beach County Divorce Statistics

**EXHIBIT D:**
Two Law Review Articles on Soviet Marriage & Divorce Law:
- "Was No-Fault Divorce Born in the Soviet Union?" by Donald M. Bolas (1975).
- "Marriage and Divorce in Soviet Law," by Vladimir Gsovski (1947).

**EXHIBIT E:**
 "The Turn Toward the Self in the Law of Marriage & Family," by Helen M. Alvare (2005).

**EXHIBIT F:**
"The Effects of Divorce on America," by Patrick F. Fagan & Robert Rector (2005)

# EXHIBIT A:

## AFFIDAVIT OF JUDY PAREJKO

STATE OF WISCONSIN
COUNTY OF DUNN

BEFORE ME the undersigned authority personally appeared JUDY PAREJKO who being duly sworn deposes and says:

1.  My name is Judy Parejko, I am over the age of 18, and make this statement on personal information.  My address is 2501 Fifth St., Menomonie, Wisconsin, where I have lived for 15 years.

2.  I received a Master of Science degree from the University of Wisconsin–Madison in Child and Family Studies in 1991. To earn this degree, I had to perform a complex statistical analysis for my thesis, using a large, national data set.

3.  In 1994, I received mediation training and in 1995, I began doing Family Court mediation in western Wisconsin, where I was hired by the local judge and several other area judges. My job was to meet with couples involved in a divorce or paternity case, and try to help them reach a "Parenting Agreement" so they could avoid having the judge impose a plan.  I also taught a post-divorce parenting class. During this period, I observed the court process in the courtroom and I also heard my clients tell about their experiences.

4.  In 1998, I took a lead role in opening a small, nonprofit Mediation Center which had a twenty-member board of directors made up of all sectors of the community. During the first year of operation, retired Minnesota Supreme Court Chief Justice Sandy Keith was the guest at a community reception and five months later, Wisconsin Chief Justice Shirley Abrahamson also attended a reception in her honor while she was in town to dedicate the new court administration building.  The Center, which worked with about ten families a month and was also involved in designing educational material and expanding its programming and outreach, closed in 2001.

5.  During the next five years, I took part in two more mediation trainings and also attended several state and national Inter-Professional conferences concerning divorce, mediation, and marriage education.  I also worked with an international mediator to help him promote his program, which had a remarkably high settlement and reconciliation rate.

6.  In 1999, I began researching family law and one of the first books I read was, *Silent Revolution: The Transformation of Divorce Law in the United States*, by Herbert Jacob (University of Chicago Press, 1988). While reading this book, I learned about a collection of documents called the "Levy Papers" which the author of *Silent Revolution* had used for reference material. These documents had been preserved by the Reporter (Robert J. Levy) hired by the National Conference of Commissioners (NCCUSL) to oversee the Uniform Marriage and Divorce Project (UMDA).

7.   In 2001, I obtained a set of microfiche records of the transcripts from the NCCUSL annual meetings at which they drafted the UMDA.  The UMDA was a "model law" created as a "template" for state legislatures to enact around the country. I spent several months transcribing the 651 pages of material from the microfiche records into a computer file and then made copies available (with permission).

8.   In my research, I learned that the NCCUSL is the "drafting arm" of the American Bar Association (ABA) and that the NCCUSL has been operating since 1892 when it was commissioned by the ABA to write "model laws," and many of their "laws" have been widely adopted by state legislatures, most notably the Uniform Commercial Code.  I learned that the NCCUSL seemed to operate in an "advisory" capacity to help state legislators with law-drafting.  I also learned that their role was not very well known by citizens because most people believe that STATE legislators write STATE laws – not a NATIONAL group.  In fact, I learned that one author labeled the NCCUSL a "shadow super-legislature" ("Shadow Super-Legislature: ULC to Meet – for 100th Time," *The National Law Journal*, July 29, 1991).

9.   In May, of 2002, I self-published a 180-page book entitled, *Stolen Vows: The Illusion of No-Fault Divorce and the Rise of the American Divorce Industry* (Instant Publisher, Collier, Tenn.), telling the story of what I'd learned about divorce law and process while working as a Family Court Mediator and also what I'd learned from my historical research into the origin of no-fault divorce.

10.  Material from my book, *Stolen Vows,* has been included by several authors in peer-reviewed articles published in law review journals, including the following:
   • Helen M. Alvare, "The Turn Toward the Self in the Law of Marriage & Family: Same-Sex Marriage and Its Predecessors," *16 Stanford Law & Policy Review*, 2005, p. 135-196.
   • Helen M. Alvare, "Saying 'Yes' Before Saying 'I Do': Premarital Sex and Cohabitation as a Piece of the Divorce Puzzle," *18 Notre Dame Journal of Law, Ethics & Public Policy*, 2004, p. 7-87.
   • Katherine Turnage Boyd, "The Tale of Two Systems: How Integrated Divorce Laws Can Remedy the Unintended Effects of Pure No-Fault Divorce," *12 Cardozo Journal of Law & Gender*, 2006, p. 609-625.
   • Katherine Shaw Spaht, "Revolution and Counter-Revolution: The Future of Marriage in the Law," *49 Loyola Law Review*, 2003, p. 1-78.
   • Katherine Shaw Spaht, "Covenant Marriage: An Achievable Legal Response to the Inherent Nature of Marriage and Its Various Goods," *4 Ave Maria Law Review*, 2006, p. 467-496.

11.  *Stolen Vows* has also been referenced or quoted in publications, both online and print, including the following policy papers:
   • "Deterring Divorce," 2004, Family Research Council, Washington, DC.
   • "Is No-Fault At Fault? The Impact of No-Fault Divorce on Divorce Rates," 2008, Florida Commission on Marriage and Family Support Initiatives.

EXHIBIT A:  Affidavit of Judy Parejko– page 2

12. I have been a guest on several radio programs where I have shared my research and experience and discussed the material in my book.

13. I have written numerous articles and my book has been cited in numerous publications, including the following:
- Crisis Magazine
- Capital Times, Madison, Wisconsin
- Eau Claire Leader-Telegram (Wisconsin)
- The Washington Times
- The Wanderer
- Michael Reagan's book, *Twice Adopted.*
- Stephen Baskerville's book, *Taken Into Custody*
- Catholic Exchange (online)
- Middletown Journal (Ohio)
- Hamilton Journal News (Ohio)
- The Denver Post
- USA Today
- Star Tribune (Minneapolis)

14. In 2005, I obtained copies of the 3,000 pages of original documents known as the "Levy Papers" which are housed at the Reisenfeld Rare Books Center at the University of Minnesota Law Library in Minneapolis. I had these documents Bate-Stamped in August of 2005. I've also researched the law and/or obtained archival material from the following places:
- Wisconsin State Law Library – Madison, Wisconsin;
- William Mitchell College of Law – St. Paul, Minnesota;
- University of Wisconsin – Eau Claire, Wisconsin;
- University of Wisconsin-Stout – Menomonie, Wisconsin
- Area Research Center, U.W.-Stout – Menomonie, Wisconsin
- Wisconsin Legislative Reference Bureau – Madison, Wisconsin;
- University of Pennsylvania Law School – Philadelphia, Pennsylvania;
- California State Archives – Sacramento, California;
- Florida State Archives – Tallahassee, Florida.

15. The "Levy Papers" and the NCCUSL meeting transcripts which I transcribed, have been made available to scholars and have been referenced in the following peer-reviewed articles published in a law review journal:
- Helen M. Alvare, "An Anthropology for the Family Law of Indis/solubility," *4 Ave Maria Law Review*, 2006, p. 497-546.
- Katherine Shaw Spaht, "Revolution and Counter-Revolution: The Future of Marriage in the Law," *49 Loyola Law Review*, 2003, p. 1-78.
- Helen M. Alvare, "The Turn Toward the Self in the Law of Marriage & Family: Same-Sex Marriage and Its Predecessors," *16 Stanford Law & Policy Review*, 2005, p. 135-196.

16. I have accumulated a library of approximately 200 books on the law and related history, as well as a library of law review articles and other source material that fill approximately six long file cabinet drawers.

17. In 2006, I began researching Florida Family Law in order to understand how the UMDA was introduced in that state and incorporated into law, because I had learned that Florida was one of the earliest states to use it, and that Florida legislators incorporated the UMDA into their 1971 HB 17-C almost completely intact. I subsequently obtained material from the Florida State Archives in Tallahassee about the enactment of this law, including an audiotape copy of the 1971 House Floor Debate on HB 17-C. From my research into 1971 newspaper accounts, I learned that no-fault divorce was first taken up by the Florida Senate at a committee meeting on February 10, 1971 in West Palm Beach finally enacted on July 1, 1971, which is record-fast time for such a sweeping overhaul of a state law that is more than 100 years old. I believe that the process of enactment was rushed and a Florida Bar Journal article (see "Faults in Florida No-Fault Divorce" by Virginia Anne Church, November, 1971) about the new law has this sub-title: "Hurried drafting pen draws stick figure."

18. I obtained a copy of a 1971 Ethics Opinion published by The Florida Bar Association (FBA) which was "Reconsidered" in 1973 (see attached), showing that attorneys did not really understand this new law nor how it was supposed to be used. The question posed to the FBA was whether one attorney could represent both the husband and wife as a "family unit," since the new law was *supposed* to eliminate the adversarial nature of the divorce process. The divided first Opinion and the subsequent Reconsidered Opinion of the FBA shows the level of confusion in the legal field about this law indicating that it was either deceptively marketed or was not understood by those who would be applying it.

19. As a result of my research, I have learned the following things and/or have drawn the following conclusions:

   a.   A national group of lawyers functioning as the "drafting arm" of the American Bar Association (ABA), and known as the National Conference of Commissioners on Uniform State Laws (NCCUSL), promulgated the Uniform Marriage and Divorce Act (UMDA) which they first approved at their annual meeting in Clayton, Missouri on August 6, 1970. The NCCUSL then revised the Act due to concerns expressed by the ABA's Family Law Section. The revised Act was approved by the NCCUSL at their annual meeting in Hyannis, Massachusetts on July 27, 1973.

   b.   Even over objections from the Family Law Section, the American Bar Association's House of Delegates approved the revised UMDA by a standing vote of 136 to 105 on February 5, 1974.

   c.   It is my opinion that the "Levy Papers" reveal that a small "inside" group controlled the outcome of this project, as evidenced by their private correspondence

which shows that their primary goal was to <u>completely eliminate judicial discretion</u> so that upon the filing of a divorce petition, the judgment would be 'automatic,' meaning, no divorces would be denied. I believe that the judicial process in this type of case was turned into a rubber-stamp operation (a ministerial act) and that, consequently, the <u>Rule of Law</u> in this country was undermined, since a rubber-stamp process is being carried out in the courtroom. I believe that "the Law" and the practice of law has been denigrated by no-fault divorce. I also believe that the state *forces* individuals through the process when they won't go willingly and that the goal is to get the defendant to "consent" to the divorce so it looks like a cooperative "mutual" process, which is the way no-fault divorce was originally promoted. I understand that the state will subsequently use its police power in the form of threats and acts of psychological terrorism to coerce from the defendant the needed "consent" and that this coercion takes the form of monetary fines, loss of time with children, and the threat (or reality) of incarceration.

d.  I believe the NCCUSL Commissioners were not comfortable with presenting their product as a rubber-stamp process, so they chose to "camouflage" it so it wouldn't look like Russian "Post Card Divorce" which was implemented during the 1917-18 Bolshevik takeover in order to *weaken family ties* as well as ties with the Church so that the State would become the replacement "authority-figure." During the August 3, 1970 NCCUSL meeting, the transcripts show that the Commissioners even <u>laughed</u> that their new law looked like Russia's. I have learned that goal # 40 of the Communist Manifesto was, "Discredit the family as an institution. Encourage promiscuity and <u>easy divorce</u>."

e.  In my research I learned that a handful of NCCUSL Commissioners objected to the UMDA and that a California State Supreme Court Justice warned the Commissioners that this kind of divorce-by-registration, which is a ministerial act, should not be done in the courtroom.

f.  I believe that Florida legislators *bought* the UMDA law-package and enacted it in record time because they relied on the legal expertise of the Uniform Law Commissioners to deliver a product that was above reproach. I believe deception was used to promote this new law, which engineered a public policy shift that was so dramatic that most people didn't understand what it was nor suspected its future impact on society. Newspaper accounts, which I have collected, marketed the law as a "mutual-agreement" process, which would eliminate rancor and reduce the cost of divorce. But, the newspaper accounts do not tell the full story, especially the details about what might happen in a "contested" case where one party maintains that the marriage is not broken and wants to preserve their intact family.

g.  A counseling option, in which the judge could order the couples to counseling for three months, was added to the law, by then-Governor Reubin Askew who, according to newspaper accounts, was concerned about Florida families due to his own fatherless childhood, but the counseling aspect is seldom used and when it is used and does not produce reconciliation, this fact is then used against families and

turned into <u>evidence</u> that the marriage is "irretrievable broken" and the divorce then moves forward without any further delay. From my own experience working with couples, I have found that healing shattered relationships can take much longer than three months, especially if there are deep-seated childhood wounds or other psychological problems.

h.    Florida legislators appear to have been duped by the Uniform Law Commissioners who were tied to the American Bar Association. I believe that Florida legislators relied too much on the expertise of these Commissioners who were prominent members of the legal community in this country and included law professors, judges, and members of elite law firms with all of them in this role by appointment of their respective governors. I believe that Florida legislators did not carefully consider what was being "sold" to them by this Commission and that they saw this new law as a "good idea" that would reduce the load on the court docket, particularly by making it a foregone conclusion and eliminating the attorney's problem of "proving" a ground as well as the judge's job of having to hear unsavory stories about bad behavior and then having to sort out the "facts." I believe that the legislators and the legal community embraced this new idea because it sounded like a good "fix" and that many of the legislators were also lawyers so they had a hidden interest in embracing this new law. There was also concern about migratory divorce, which meant a loss of revenue for state lawyers. In the end, I believe that Florida citizens were also likewise, duped by their duped and misguided legislators.

i.    Florida lawyers also appear to have been confused about how this new law was supposed to operate, as evidenced by The Florida Bar Association's 1971 Ethics Opinion 71-45 and its 1973 (Reconsidered) Ethics Opinion about whether or not one lawyer could represent both parties as a family unit, since the new law had been so heavily promoted as "non-adversarial," or whether each party needed to have their own lawyer.

j.    In conclusion, I believe that Florida's Chapter 61 combined set of "no-fault" divorce statutes operate to cause egregious harm to children, adults, families, and society, and that it also undermines the Rule of Law as well as the Institution of Marriage.

20.  Aside from my historical analysis of no-fault divorce and my professional experience working with divorcing couples, I have also had my own personal experience of "no-fault" divorce. In 2005, my husband of 36 years filed a petition for a "no-fault" dissolution of our marriage, which was subsequently granted in 2006, based on the following "findings of fact" on a checkbox form submitted by my husband after the court hearing stating:

The marriage is irretrievably broken in that ☐ Husband ☐ Wife ☐ both parties has/have stated under oath that the marriage is irretrievably broken. The Court finds there is no reasonable prospect for reconciliation between the parties.

EXHIBIT A:  Affidavit of Judy Parejko– page 6

The only box that was checked was the one next to "Husband." The dictionary meaning of *irretrievably* is "lost forever," but I just spent an enjoyable two-weeks traveling with my husband at his invitation.

21. On June 10, 2008 I contacted my local clerk of court and asked: How many divorces are judicially denied each year? She replied that, in the fifteen years she's served as clerk of court, NONE had been denied.

22. My personal experience of "no-fault" divorce has only served to reinforce my belief that something is terribly wrong with our family court system. First of all, the legal arena is the *last* place to handle fragile human relationships – a different venue is needed. I also believe that Wisconsin's Family Courts (along with the family courts in every other state) operate in a manner akin to Soviet Russia's Post Card Divorce, since one party can: (1) be granted a divorce after unilaterally filing a simple check-box form, (2) be assured that the sitting judge will always grant the divorce. As in Post Card Divorce, the other party is not heard and cannot defend against the charge of "irretrievably broken." The judge's role has become that of a bureaucrat terminating the marriage through his/her signature. In no-fault divorce, judges do not act judicially – they *administer* divorce with except when it comes to settlements during which they carry out a type of Family Court "takings doctrine" in which shared property and time with children are taken from the "family unit" and then given to one of the parties. I believe the people of this country have been the victims of a Great Deceit, which could be more properly called a Grand Theft, because I believe they have been deceived by their trusted officials and policymakers who, likewise, may have been deceived by members and affiliates of the American Bar Association who encouraged them to adopt as public policy their "no-fault divorce" doctrine, codified in a master 'blueprint' that was known as the **Uniform Marriage and Divorce Act.** I believe that members of both the American Bar Association who approved the Uniform Marriage and Divorce Act, as well as their drafting arm, the Uniform Law Commission, perpetrated "Treason on the Constitution." This model law is repugnant to the Constitution because it strips defenses from the accused and positions judges to carry out a "ministerial function" in a lawsuit that can no longer be considered a "case in controversy." The record shows – in Florida as well as in Wisconsin and every other state that has been surveyed – that divorces are <u>never</u> judicially denied, which means that the filing party always "wins" this type of lawsuit, and this violation of constitutional protections would be anathema to our Founding Fathers. I believe that what was done to children, adults, the institution of marriage, family-life, and society is the biggest scam every perpetrated on the American people and that it operates as an "open secret" playing out in courtrooms every day for nearly forty years, in spite of the dedicated officials who, at the time, warned against the law. I have also come to believe, in spite of my deep-seated resistance to even consider this idea, that the deception perpetrated on the American people might have emanated from the one of the goals of the Communist Manifesto: Discredit the family as an institution, encourage promiscuity and easy divorce." For all the above reasons, I file this Affidavit in support of the Complaint for Declaratory and Injunctive Relief filed by Kathy Garcia-Lawson.

FURTHER AFFIANT SAYETH NAUGHT

*Judy Parejko*
Judy Parejko, Affiant

STATE OF WISCONSIN
COUNTY OF DUNN

Sworn to and subscribed before me this 9TH day of June, 2008, by JUDY PAREJKO, who produced a Wisconsin Driver's License as identification.

*Ione Labs*
Notary Public

My Commission expires: 3 - 15 - 2009

EXHIBIT A:  Affidavit of Judy Parejko– page 8

# EXHIBIT B:

*Kathy Garcia-Lawson's Complaint for Declaratory Judgment &*
*Injunctive Relief Regarding the Constitutionality of Florida Marriage & Divorce Law*

# Florida's 'Dissolution of Marriage' Statutes (No-Fault Divorce) and the Uniform Marriage and Divorce Act (UMDA)

[Prepared by Judy Parejko]

*Florida's No-Fault Divorce Law (called Dissolution of Marriage) was based on a national "model law" known as the Uniform Marriage and Divorce Act (UMDA) drafted by the National Conference of Commissioners on Uniform State Laws (NCCUSL). A brief history is presented below, along with a list of the main actors involved. Numbered keys in brackets are provided to reference the attached documents, which include material from the "Levy Papers" and from other archival collections, as well as the NCCUSL Transcripts from the UMDA Project.*

### Brief History of the NCCUSL, the UMDA, and Florida's No-Fault Divorce Law

In 1891, the American Bar Association's (ABA) conceived the idea of a Uniform State Law Commission to serve as their "drafting arm." The Commission met for the first time in 1892 and was eventually known as the **National Conference of Commissioners on Uniform State Laws** (NCCUSL, and hereinafter referred to as the 'Commission').

The Commission is made up of judges, practicing attorneys, and law professors who are appointed by their respective state governors. They meet annually to draft and approve new 'uniform' laws that are then promoted to state legislatures.

In 1965, the Commission announced they were embarking on a new special Project to draft a uniform marriage and divorce law.

In 1966, William J. Pierce, Chairman of the Commission's Executive Committee, applied to the Ford Foundation for a grant and in January 1967, the Ford Foundation awarded $60,000 for the Project.

In February 1967, the U.S. Department of Health, Education and Welfare awarded the Commission a grant of $25,000 with an additional amount awarded later. Prof. Robert J. Levy was hired to serve as the 'Reporter' for the project, and in April 1968, Prof. Herma Hill Kay was hired as 'Co-Reporter'. Both Reporters worked closely with Commission leadership, including Maurice Merrill (Project Chairman), Allison Dunham (Executive Director of the Commission) and William Pierce (Chairman of the Commission's Executive Committee).

One of the Project's goals was to eliminate judicial discretion. Merrill wrote this comment about the law: **"This section expressly forbids the court to refuse to dissolve a marriage if one or both parties desire that it shall end following the 90 day waiting period."** [1]

Merrill wanted to completely eliminate grounds for divorce and said this in a letter: "**The important thing is to do away with the necessity of stating a 'cause of action'**..." [2]

Herma Kay pressured Robert Levy in a letter to him that judicial discretion should be completely eliminated by making a 'judgment' of divorce automatic – turning the 'divorce decree' into a 'foregone conclusion' from the outset – saying in a letter, "**Why should [the court] be allowed to deny the divorce?**" [3]

Brigitte Bodenheimer, who reviewed the first draft of the law, expressed strong criticism that it went too far and wrote this comment to Robert Levy: "**The appropriate form of divorce under these conditions would be divorce by registration in an administrative office.**" [4]

California Supreme Court Justice Louis H. Burke wrote a letter to the Commissioners, warning them about what they were proposing, "...**the proceeding has no business in a court of law and should be relegated to a ministerial function in the marriage license bureau.**" [5]

On August 1, 1970, Commissioner Fred T. Hanson from Nebraska expressed several objections to the draft during the annual meeting, saying that the '**unclean hands doctrine' would be overturned**, that '**irretrievable breakdown' had no definition**, that divorce would be based on a **foregone 'conclusion' rather than 'factual evidence'**, and that the proceeding would really be '**administrative', not judicial**. [6]

During the 1970 meeting, the transcript records that the Commissioners laughed that the process might look too much like '**Russian style**' divorce if there wasn't a hearing. [7]

The Reporters, as well as the Commissioners, understood that such a radical change in the law would not be acceptable to state legislators nor to the public, and discussed how **they would have to "camouflage" the process** by requiring a 'hearing' with a judge presiding in order to make the process *appear* 'judicial.' [8]

The Commissioners approved the UMDA draft at their 1970 annual meeting, but the Family Law Section recommended that the ABA's House of Delegates not approve it. [9]

The draft was **not** approved by the ABA House of Delegates that year but the revised draft **was approved** in 1974 over objections from the leadership of the Family Law Section. [10]

One legal scholar remarks about the new standard, **Irretrievable Breakdown**, in his book: that "no guidance is given for the determination of this vague term… irretrievable breakdown means whatever a court chooses it to mean." [11]

A long list of professionals complained that the **UMDA had problems** or that **Irretrievable Breakdown was not defined**. [12]

In February 16, 1971, Florida legislators introduced a new state divorce bill, saying, "**It was the consensus of the [Florida] Judiciary to use HB 17-C and the Uniform Marriage and Divorce Act as vehicles for staff to draft a Committee Bill.**" [13]

In November 1971, a Florida Bar Journal article has this sub-title: "**Hurried drafting pen draws stick figure.**" The author ties the Florida law to the NCCUSL law: **Florida law incorporated "identical language" for Irretrievable Breakdown as the Uniform Marriage and Divorce Act.** [14]

In the Florida Supreme Court case, Ryan v. Ryan 277 So. 2d 266, 277, (1973), Florida Attorney General Robert L. Shevin states the following in his Intervenor Brief: "**Florida's no-fault divorce law is based on the Uniform Marriage and Divorce Act which was drafted by the National Conference of Commissioners on Uniform State Laws, August 1—7, 1970.**" [15]

----------------------------------------------------------------------------------
**Professional Affiliations**

**Louis H. Burke** – California State Supreme Court Justice, former Uniform Law Commissioner who had resigned after being appointed to the California Supreme Court.

**Allison Dunham** – professor at the University of Chicago Law School and serving as Executive Director of the Uniform Law Commission.

**Floyd R. Gibson** – circuit court judge from Missouri and a NCCUSL Commissioner

**Brigitte Bodenheimer** – professor at the University of California, Davis, School of Law who served as Reporter on the Uniform Child Custody Act drafting committee.

**Fred T. Hanson** – circuit court judge in Nebraska and NCCUSL Commissioner

**Herma Hill Kay** – professor at the University of California, Berkeley, School of Law.

**Robert J. Levy** – professor at the University of Minnesota Law School.

**Maurice H. Merrill** – professor at the University of Oklahoma College of Law who served as Chair of the Uniform Marriage and Divorce Act Project.

**William J. Pierce** – professor at the University of Michigan Law School who served as the Chairman of the Executive Committee of the Uniform Law Commission

## NUMBER KEYS TO ATTACHED ITEMS:

**[1 – 1 page]** October 21, 1968 "Tentative Draft #1" of the "Dissolution of Marriage" section of the UMDA prepared by Herma Kay (Robert J. Levy Papers, U. Minn. Law Library, Bate-Stamped: 'UMDA 00574').

**[2 – 1 page]** November 1, 1968 correspondence from Maurice Merrill to Herma Kay (Robert J. Levy Papers, U. Minn. Law Library, Bate-Stamped: 'UMDA 00566').

**[3 – 1 page]** November 18, 1968 correspondence from Herma Kay to Robert Levy

(Robert J. Levy Papers, U. Minn. Law Library, Bate-Stamped: 'UMDA 00555').

**[4 – 1 page]** June 2, 1969 correspondence from Brigitte Bodenheimer to Robert Levy about the UMDA draft (Robert J. Levy Papers, U. Minn. Law Library, Bate-Stamped: 'UMDA 03440').

**[5 – 1 page]** September 26, 1969 correspondence from Louis H. Burke to the NCCUSL Commissioners (Robert J. Levy Papers, U. Minn. Law Library, Bate-Stamped: 'UMDA 01336').

**[6 – 4 pages]** August 1, 1970 NCCUSL Transcripts, statement by Nebraska NCCUSL Commissioner Fred T. Hanson (Robert J. Levy Papers, U. Minn. Law Library, Bate-Stamped: 'UMDA 02098-02101').

**[7 – 1 page]** August 3, 1970 NCCUSL Transcript, statement by Virginia Commissioner John B. Boatwright (Robert J. Levy Papers, U. Minn. Law Library, Bate-Stamped: 'UMDA 02293').

**[8 – 2 pages]** August 3, 1970 NCCUSL Transcripts, statement by Missouri NCCUSL Commissioner Floyd R. Gibson (Robert J. Levy Papers, U. Minn. Law Library, Bate-Stamped: 'UMDA 02297 & 02298') .

**[9 – 2 pages]** February 3, 1972 memo outlining the UMDA Project timeline, prepared by Maurice Merrill  (Robert J. Levy Papers, U. Minn. Law Library, Bate-Stamped: 'UMDA 01994 & 01995').

**[10 – 2 pages]** 1974 ABA Reports, pages 178-181.

**[11 - 2 pages]** Page 385 in Max Rheinstein's *Marriage, Stability, Divorce, and the Law*, Univ. Chicago Press, 1972.

**[12 – 3 pages]** List of professionals that had complaints about the UMDA or who said that Irretrievable Breakdown was not defined.

**[13 – 1 page]** June 1971 legislative record from the Florida State Archives, giving the timeline of activity for the Committee Bill.

**[14 – 2 pages]** Vol. 45, Florida Bar Journal, "Faults in Florida No-Fault Divorce," by Virginia Anne Church, pages 568-569 (November, 1971).

**[15 – 1 page]** Intervenor Brief filed on July 21, 1972 by Florida Attorney General Robert L. Shevin in the Florida Supreme Court Case, Ryan v. Ryan 277 So. 2d 266, 277, page 8 (1973).

Dissolution of Marriage, TD # 1                    Page six

day period, ~~one or both~~ parties moves that the

marriage be dissolved, the court shall find that

the marriage has (irretrievably) broken down and

shall enter its order dissolving the marriage.


COMMENT to section 9.  This section expressly forbids the

court to refuse to dissolve a marriage if one or both parties

desire that it shall end following the 90 day waiting period.

It is an effective answer to those critics who object that

judges will simply rely upon their own prejudices in deciding

whether to allow divorces under the breakdown standard.  It is

also a candid recognition that courts cannot, by denying divorces,

force persons to live together. It is identical to the proposal

made by the California Commission on the Family.


Section 10.  All orders of the [_____] court dissolving a marriage

          shall be effective when entered.


COMMENT to section 10.  This section will abolish the interlocutory

period in those states which still retain such a period.


Section 11.  If the court finds that the marriage has (irretrievably)

          broken down, (it may) upon request of both parties, order

          their legal separation rather than the dissolution of

          their marriage.  The granting of such an order shall

          not prevent either spouse from subsequently filing a

          new petition of inquiry as provided in section 4.

**UMDA 00574**



COLLEGE OF LAW
630 PARRINGTON OVAL

# THE UNIVERSITY OF OKLAHOMA

### NORMAN, OKLAHOMA 73069

November 1, 1968

Professor Herma H. Kay
University of California Law School
Boalt Hall 1819
Berkeley, California

Dear Herma:

At last I've had time to get over your draft, which I now
return, with longhand suggestions and comments, which I hope
are legible and intelligible.

In addition, let me make a few other suggestions.

One, very minor, is that the term "petition", as used in
Sections 4 and 5, will present no novelty, in many jurisdictions.
In Oklahoma, in all actions, including actions for divorce, the
initiatory pleading is termed a petition. Hence we would not
be substituting a "neutral" term for an "adversary" term, as
your comment suggests. I do not believe it is highly important
to change the name of the pleading. The important thing is that
we do away with the necessity of stating a "cause of action",
with its invocations of adversary concepts. So, perhaps it would
be sufficient, as well as proper, simply to bracket the name of
the pleading, leaving each state free to use whatever name is
used in its established practice.

I am not sure that I agree, either as matter of policy or of
expedience, with your Section 9. As your comment indicates, the
section ultimately established divorce at the will of either
party. I'm not sure that the court ought not to have some
discretion. Compare <u>Schlesinger v. Schlesinger</u>, 399 F.2d 7
(3d Cir. 1968). By the way, have you seen my doggerel in
11 Oklahoma Law Review 430, which may strike you as not wholly
in accord with these expressions. However, that deals with
different statutory language. I think that, if Section 9 were

UMDA 00566

UNIVERSITY OF CALIFORNIA, BERKELEY

BERKELEY · DAVIS · IRVINE · LOS ANGELES · RIVERSIDE · SAN DIEGO · SAN FRANCISCO  SANTA BARBARA · SANTA CRUZ

SCHOOL OF LAW (BOALT HALL)
BERKELEY, CALIFORNIA 94720

November 18, 1968

Dear Bob:

Yours of the 15th received. I am
enclosing a letter to Maurice which is self-
explaining. Will you please make the change
from "it shall conclude" to "it shall find" in
sections 7, 8, and 9 before you send out the
material? I do want you to send draft two
plus the comments to draft one.

Let's talk about the arrangement of
the statute in Chicago. I take it you are
planning to send x out my form, at least for
the December meeting.

And I have a bone to pick with you.
I was absolutely shocked by your 4.207. What
do you mean, "the court may refuse to dissolve
the marriage"? If the court doesn't like the
wife or child support arrangements, then let it
order its own as part of the decree. But why
should it be allowed to deny the divorce? I'm
willing to fight Maurice if necessary, but I
thought you and I were in agreement on this
point! Write or call -- I am really disturbed.
(Second thought: maybe you mean only that the
court can postpone dissolution until the
parties come to an agreement it can approve.
In that case, the section needs to be made
clearer.)

Please resolve my anxiety at your
earliest convenience.

Yours,

Herma H. Kay

UMDA 00555

I think that the judiciary should not be made a party to a scheme of fictions which surpasses the often complained of farce of finding "cruelty" under existing divorce procedures. As several of the participants in the December meeting have remarked, there is no need for the participation of the courts in the divorce process under these circumstances. The appropriate form of divorce under these conditions would be divorce by registration in an administrative office. This does not exclude subsequent court proceedings to settle property matters and child custody, somewhat like the dissolution of a business partnership where the court does not participate in the decision whether the partnership should be dissolved or not. If divorce by registration does not seem to be politically wise because it is not acceptable to the majority of the people of the United States, a different statute would have to be devised.

III. It is astonishing to find that some of the participants in the December meeting consider "breakdown of the marriage" to mean nothing more than the unwillingness of one of the spouses to continue the marriage. As one of the advisors stated, "if one partner says that the marriage has broken down, it has broken down." (Proceedings December 1968, 21, 54). If this is to be the meaning of "breakdown" which is to be conveyed to the judges who administer the uniform law, the draft misleads and deceives many Commissioners, legislators and the public. It is obvious that this is neither the common meaning of the term nor is it what Justice Traynor had in mind in de Burgh, nor is this the breakdown concept which underlies the discussion in Professor Levy's monograph. If the purpose is to use the "breakdown" idea because it has recently become popular and is politically attractive, and to use it in a watered-down form which makes it

UMDA 03440

**Supreme Court of California**

STATE BUILDING

SAN FRANCISCO

September 26, 1969

IIS H. BURKE
JCIATE JUSTICE

Members of the Special Committee
National Conference of Commissioners
  on Uniform State Laws

Gentlemen:

I am taking the liberty of sending you a copy of my letter of April 30 to Mr. Dunham concerning one phase of the proposed uniform divorce law which troubles me very much. It appears from my review of the proceedings in committee of the whole that the tentative views of its members at least are opposed to the point of view which I am expressing.

I understand that the committee's studies thus far have been based in part upon the studies and recommendation of the California Commission which recommended a proposed statute to the state Legislature. As presented, the ultimate effect of that statute, although purporting to permit divorce upon a court finding of irremediable breakdown of the marriage, was to require a divorce decree upon the request of both or or one of the parties. I opposed this feature of the measure for the same reasons indicated in my letter to Mr. Dunham, and as finally enacted this feature of the bill was removed and as the new law now stands no dissolution may be entered until there is a finding by the court based on the evidence that there are irreconcilable differences which have caused the irremediable breakdown of the marriage. I respectfully submit that if marriage is to be terminable by unilateral action without any judicial determination that the marriage is in effect dead, then the proceeding has no business in a court of law and should be relegated to a ministerial function in the marriage license bureau.

The great tragedy would be the burial of thousands of marriages which but for want of a little professional assistance and encouragement could be restored to a state of good health, and as to many of them an even stronger bond than existed before.

In speaking of these matters I am not indulging in theory but from my own personal experience and interest in this field.

Sincerely,

Louis H. Burke
Associate Justice

Enclosure

UMDA 01336

5

spell him if he needs assistance--and I would like to reempha-size the chair's announcement: Will you please identify your-self by name and state? This greatly aids the reporter. It also is an aid to your fellow Commissioners. Judge Gibson!

CHAIRMAN READ: Before Judge Gibson starts, I would like to recognize Commissioner Fred Hanson for the purpose of making some preliminary remarks from the floor.

MR. F. T. HANSON: Mr. Chairman, I address myself to the general policy of the Act, so far as it pertains to divorce. It seems to me to do justice between parties without regard to fault is an impossibility. I wonder what's to become of the maxim that no man shall profit by his own wrong--or woman either, for that matter.

The proponents of this Act say that the divorce prob-lem is different because there is fault on both sides; but, humans being what they are, there is fault on both sides in every human relationship. The faults, however, are far from equal. No secular society can be operated on the theory that all faults are equal. Adultery is more serious than abusive language, just as murder is more serious than larceny, although I understand that in the old days on the border between Arkansas and Missouri--and I forget which side of the line it was--they would fine you for killing a man, and hang you for stealing a

UMDA 02098

6

mule. [Laughter] But I understand that this has been cor-
rected. If you want to know more about it, Judge Gibson or
Commissioner Barrett can enlighten you.

It's an astonishing thing how often opposites of
conduct attract; and this results in inequalities of faults.
When this occurs, to disregard the inequality of fault is to
blindfold justice. Oregon recognizes the inequality of fault,
but endows it with weightlessness by granting divorce to the
party most at fault if the other is not seeking it or is oppos-
ing the divorce.

The theory that the state has an interest in the
stability of the family is unquestionably wise, but under this
law it has no more effect than a particular judge chooses to
give it. The concepts that implement the theory of the state's
interest--the requirement of definite grounds, collaboration
and defenses such as collusion--all are scrapped. In their
place we have new terms that defy definition: "irretrievable
breakdown" or "irreconcilable differences." Decisions are to
be made on a conclusion, and not on basic facts.

According to a comment in _Prospectus_ magazine for
May, it says that California has conciliation procedures and
trained staff workers who become thoroughly familiar with the
rocky marriages. This may compensate to some extent for the

UMDA 02099

7

indefiniteness of the grounds, but this Act provides only that the judge may suggest to the parties that they seek counseling. If the court is to rely on conclusions instead of factual evidence, the divorce proceeding becomes more of an administrative than of a judicial process. Moreover, providing comparable machinery to that which they have in California may very well be impracticable in sparsely populated areas.

California Senator James A. Hayes, the chief architect of the California law, says in an article in the last American Bar Association <u>Journal</u> that discarding the traditional grounds, collaboration, and defenses, and suppressing evidence of specific acts, as they do in California, will reduce the acrimony between the parties and the trauma to the children, thus making divorce a less bitter pill; but in the typical case reaching the filing stage, everything will have been said. The children will know most of what is to come out in the pleadings or the evidence, and, typically, will learn little or nothing more from these. The real trauma to the children is the permanent separation of the parents. Therefore, the anticipated benefits are illusory. Injury to the innocent cannot be eliminated here any more than it can in criminal law enforcement.

But when the divorce pill is sugar-coated, inevitably

UMDA 02100

8'

more people will take it, and more children will be victims
of the trauma. Senator Hayes says the sugar coat will reduce
the divorce rate. Now, I am old enough to remember when pills
were not sugar-coated. The coating was added to pills in order
that they would be taken more readily, and I personally know
that it works. Senator Hayes' premise supports the opposite
of his conclusion. It will not reduce the divorce rate; it
will increase it.

Advocates of easy divorce say: How cruel it is to
keep people tied together when they are not happy! It's true
that all restraints are in a sense cruel, but without the
sturdy fence the bawling cattle in the pasture would be destroy-
ing themselves in the green corn and damp alfalfa. And so it
is with the restraints on divorce. [Laughter]

Acts such as this one that is proposed discard all
the time-tested experience of the past. They destroy the es-
tablishment, so far as divorce is concerned. They offer in
its place vague terms, "irretrievable breakdown" or "irrecon-
cilable differences," grounds which are in themselves a con-
clusion and not a basic fact. If every state should enact
such a uniform law as is proposed, when would the content of
these fuzzy terms cease to vary, not only from state to state
but from judge to judge? The proposed law actually is in the

**UMDA 02101**

they have suddenly evaluated the very thin problems that have kept these people apart during the period of temporary separation, and I'm satisfied that the court proceeding is vary salutory in bringing people to the true evaluation of their marriage, and I would urge that this motion be defeated.

MR. BOATWRIGHT: Mr. Chairman, Commissioner Braucher's motion, I think, should be supported if he will add the provision for a hearing. I don't know whether that would be agreeable to him or not.

MR. BRAUCHER: My motion did not deal with that subject.

MR. BOATWRIGHT: I understood your motion to be, sir, that you wanted it automatic in the case of the two parties agreeing.

CHAIRMAN READ: As I understand the Commissioner, he wants it automatic, but he doesn't mind if it's automatic after a hearing. [Laughter]

MR. BOATWRIGHT: If you are not going to provide for a hearing, then it seems to me you ought to really simplify and speed the thing up by merely authorizing the parties to file a certificate in the office of the clerk of the court-- no more--saying, "We're divorced." I understand that's the Russian style. [Laughter]

A60

because there has been no action taken, cases where the par-
ties have brought a divorce case and later reconciled, went
back to live together, and solved their own problem.

So a great many of these actions are started at a
time when the parties are angry at each other, and eventually
reconcile, and this happens so frequently that I certainly
think that there ought to be some cooling-off period, and espe-
cially in the cases where there are minor children.

[Calls for the question]

CHAIRMAN READ:  Before the question Judge Gibson
would like to speak.

MR. GIBSON:  Mr. Chairman, I would like to say a few
words on this motion, because it goes to the entire heart of
the Act.  I think the Conference should understand the impor-
tance of the motion.

Now, if by this Act you want to allow a consensual
divorce, a divorce by registration, why, now is the time to
decide that fact.  I don't think many of the fifty legislatures
in the states will take an Act that provides for consensual
divorce, and what it amounts to if the motion carries is that
you are using the court in a ministerial capacity to carry out
a clerk's function.

If you want to do that, go all the way, then.  Don't

get the court involved. You don't need a court order ordi-
narily to get married. Now, if you want to allow a dissolution
of the marriage by a registration, enact a section to that ef-
fect. But I don't think many of the legislatures will buy
that.

If you want to camouflage it, then, by saying, well,
we are using a judicial process because the parties have to
file a petition, then when they file the petition the judge
has no discretion. The judge has no discretion in the matter.

Now, this is based on a sound judicial discretion.
The judge uses its discretion, which of course at times a judge
does, or will. There is a remedy for that. But I don't see
how you can legislate on the basis that in every action a
judge is going to be using his discretion. If he does, of
course, he shouldn't be a judge, and he won't be a judge very
long.

Now, to take care of one or two isolated instances in
a state or a county by taking away all judicial discretion in
this matter--you are making an Act, then, that is entirely
foreign to the concept of divorce at this time. I will admit
that this is an approach that is advocated by some groups,
and some people favor it. It was considered in England, and
turned down. It was proposed to the California Legislature,

Gibson, Callow, Deacon, Hellring, Hooper, O'Connell, Ruud of
the Special Committee; R. Sullivan, Section Chairman, Eugene
Burdick, Chairman, Executive Committee, and additional Section
members Buerger, W. Sullivan, R. White.  Invitations had been
sent to all Advisors, Consultants, and to other persons regarded
as representative of significant groups concerned with the
problems dealt with by the Act.  Attendants in this category
were O. Merrill, Edward D. Rosenberg and Ralph Podell of the
Section of Family Law, William J. Pierce, Executive Director
of the Conference.  In addition, written comments on the draft
were received from a number of others who had been unable to
comply with the invitation to appear personally, which comments
were available to the Section.  Oral comments were made by
Messrs. Podell and Rosenberg.  While critical of certain facets,
such as "irretrievable breakdown" without definition, use of
"unconscionability," adequacy of attorney's fees, time require-
ments as to jurisdiction, they indicated generally favorable
views as to act as a whole, and eventually seemed not to regard
their strictures as constituting insurmountable opposition to
the draft.  Other comments also were considered.  The Section
then closed the formal public hearing and convened in official
session for consideration of the draft, section by section.
After going through the draft, and voting on specific questions,
the Section meeting was adjourned, to be reconvened at St. Louis,
July 31, 1970, a meeting which later was advanced one day.

July 30, 1970.  At meeting of Section F, the revised draft was con-
sidered, section by section, and, after certain changes were
made was recommended to the Conference for submission to the
Committee of the Whole for consideration and final adoption.

August 1 through August 4, 1970.  Act subjected to debate and amend-
ment in Committee of the Whole, with redrafting sessions by
Special Committee to meet points raised in the Committee.  As
amended, recommended to Conference for adoption on vote by
states.

August 6, 1970.  Uniform Marriage and Divorce Act approved on vote
by states.

Following this approval, M. Merrill and O. Merrill
presented the Act before the Council of the Section of Family
Law.  It was voted to defer action on the Act until official
copies could be secured.  Because of this, the House of Dele-
gates of the ABA deferred action on the approval of the Act.

-9-

UMDA 01994

November 28, 29, 1970. Family Law Section Council received comments on the Uniform Marriage and Divorce Act, commenting favorably and unfavorably upon certain portions. There was a preponderance of unfavorable comment upon those portions as to which recommendations from the Section's representatives had not been accepted by the Conference. The recommendation was made that the Section "go on record as disapproving the Uniform Marriage and Divorce Act in its present form and state our reasons for our rejection of the Act; that this Section shall agree to cooperate with the National Commissioners (sic) in drafting a new Act only if we can effectively participate therein and not just act as advisors whose opinions, judgments and advice are not given any consideration." It must be commented that the last statement obviously is shown by the preceding record to be in error. There was full consideration given to the "opinions, judgment and advice" of the FLS accredited representatives. The true animus of the comment is: "We just won't play unless our views are taken in toto."

However, despite this hostile recommendation, efforts continued between Chairman Infausto of the FLS and Section Chairman Callow, Chairman Merrill of the Special Committee, Commissioners Hellring, O'Connell, and others to resolve so far as possible the differences between the two bodies. Viewpoints were exchanged, and an agreement was reached for a joint meeting of representatives of FLS and the Special Committee in the Spring of 1971. Meanwhile, in view of this proposal, it was agreed that the American Bar Association House of Delegates be asked to withhold voting on the approval of the Act until it was ascertained whether agreement could be reached. The House of Delegates so voted.

April 1-2, 1971. Meeting between Special Committee and Committee of FLS Section. In attendance: Representing Family Law Section-Infausto, Gibbs, Foster, Kolwyck, Talley, Ehrlich. Representing NCCUSL-Merrill, Burrage, Mentschikoff, Munter, Hooper, Gibson, Deacon, Burdick, Dunham, Pierce, O'Connell, Callow, Hellring.

At the beginning, it was indicated to the FLS membership that the authority of the Special Committee was limited to making recommendations to the Conference, which alone had power to make alterations in the Act, and, as a corollary to this, it was agreed at the close of the meeting that, because of the special schedules of the Conference and of the ABA, it would be

-10-

**UMDA 01995**

recommendation be deferred until the 1974 Annual Meeting. The motion for deferral was approved.

**Section of Administrative Law,**[24] Frank M. Wozencraft of Texas, Section Chairman, informed the House that the Section's recommendation would support legislation to withdraw from the President the power of review or approval of Civil Aeronautics Board actions involving certificates of public convenience and necessity to U.S. air carriers for overseas and foreign air transportation. At the request of the Standing Committee on Aeronautical Law, the Section agreed to ask the House to defer action on this recommendation until the 1974 Annual Meeting. Upon Mr. Wozencraft's motion, action was deferred.

**Commission on Correctional Facilities and Services.**[25] The Commission submitted a recommendation to endorse generally the correctional standards of the National Advisory Commission on Criminal Justice Standards and Goals. In the absence of the Commission's Chairman, Richard J. Hughes of New Jersey, Secretary Kenneth J. Burns, Jr. reported that the Board of Governors had recommended that action on the Commission's recommendation be deferred until the 1974 Annual Meeting to permit the Section of Criminal Justice to review the standards. Upon motion of Mr. Burns, action was deferred.

### Third Session

The House reconvened for its third session at 9:00 a.m. on Tuesday, February 5.

**Nomination of Officers and Members of the Board of Governors.** Chairman Groves announced that the State Delegates had nominated the following persons as officers and members of the Board of Governors for terms beginning with the adjournment of the 1974 Annual Meeting:

*President-Elect.* Lawrence E. Walsh. New York. New York;

*Chairman of the House of Delegates.* John P. Bracken. Philadelphia. Pennsylvania;

*Secretary.* Kenneth J. Burns, Jr., Lancaster, Ohio;

*Treasurer.* Karl C. Williams, Rockford, Illinois;

*Board of Governors:* Seventh District. George G. Bailey. Wheeling. West Virginia; Eighth District. I. Stanley Chauvin, Jr., Louisville, Kentucky; Tenth District, David R. Brink, Minneapolis, Minnesota; Eleventh District, Earl Q. Gray, Ardmore, Oklahoma; and Thirteenth District, Grant Armstrong, Chehalis, Washington.

**National Conference of Commissioners on Uniform State Laws,**[26] Harold E. Read, Jr., of Connecticut, the President of the Conference, moved for

[24] The full report of the Section appears at page 417.
[25] The full report of the Commission appears at page 312.
[26] The full report of the Conference appears at page 552.

---

*Whereas.* The disadvantaged person population includes those incarcerated in federal and state prisons; and

*Whereas.* Various work-release programs have been initiated to facilitate the rehabilitation of disadvantaged persons incarcerated in federal or state prisons;

*Therefore, Be It Resolved.* That the American Bar Association favors the elimination of procurement policies and laws which prohibit the availability of aid to such disadvantaged persons who are in federal or state prisons under work-release programs approved by the Secretary of Labor.

Upon motion of Mr. Currie, without debate and by voice vote, the House approved the Section's third recommendation, as follows:

*Resolved.* That the American Bar Association recognizes the need for a federal charging lien for attorneys in order to insure that no client with a meritorious claim against the Federal Government will be denied legal assistance because an attorney lacks assurance that he will be paid for such services.

*Resolved.* That the President of the Association or his designee be authorized to present the above views of the American Bar Association and to support implementing legislation embodying the following criteria on behalf of the Association before Congress or any other appropriate forum:

1. establishing a uniform federal statutory standard rather than a local standard;

2. establishing such a lien as an exception to the Anti-Assignment Statute to avoid cases like *Pitman v. United States,* 127 Ct. Cl. 173, 116 F. Supp. 576 (1954);

3. prohibiting set-off by the United States unless set-off claims are specifically asserted within thirty days from the time the attorney furnishes to the Government written notice of the amount of attorney fees due or to be due to avoid cases like *Madden v. United States.* 178 Ct. Cl. 121, 371 F. 2d 469 (1967);

4. giving jurisdiction to enforce the lien to appropriate federal courts.

The Section's final recommendation was presented by Mr. Hannah and, upon his motion, the House approved an amendment to the Section's by-laws to designate former Section Chairmen as honorary members of the Section Council.

**Standing Committee on Association Communications.**[23] Committee Chairman Paul B. Comstock of California presented the Committee's recommendation for support of S. 260, the "Government in the Sunshine Act." Noting that a number of sections and committees had not had an opportunity to study the report, Mr. Comstock moved that action on the

[23] The full report of the Committee appears at page 255.

approval of the Uniform Marriage and Divorce Act. Mr. Read informed the House that the Act, as amended after negotiation with the Section of Family Law, allows for the dissolution of a marriage on the grounds of irretrievable breakdown, defined by the Conference as serious marital discord adversely affecting the attitude of one or both of the parties of the marriage. He stated that the Section of Family Law disagreed with the Conference's recommendation, and proposed instead that the sole test of irretrievable breakdown be 180 days separation without any prospect of reconciliation.

Néva B. Talley of Arkansas, Delegate of the Section of Family Law, reported that the Section objected to the Act and would urge further amendments and revisions prior to approval of the Act.[2] She reported to the House that the Section's disapproval of the marriage portion of the Act included the recognition of a marriage in accordance with a mode recognized by any religious denomination or native group: the Section would prefer that the words "native group" be stricken to prevent confusion. She stated the Section's opposition to the recognition as valid of marriages that were validly contracted in other states and proposed inclusion of a clause that would prevent recognition where the marriage violates the strong public policy of a state. The Section also opposed that portion of the draft that allowed for marriages at age eighteen without parental consent and at sixteen with parental consent: the Section proposed twenty-one as the appropriate age without parental consent and eighteen with parental consent. Mrs. Talley also expressed the Section's opposition to that portion of the draft permitting marriage by proxy and to the three-day, rather than a ten-day, waiting period between application for and granting of a marriage license.

Ralph J. Podell of Wisconsin, Last Retiring Chairman of the Section of Family Law, received unanimous consent to speak in opposition to the portions of the Act which dealt with divorce. He stated that the revision of the draft contained alternate provisions on disposition of property which allow states to choose one rather than the other, thus insuring that "forum shopping" would continue. The term, "irretrievable breakdown" used in the Act was vague and overly broad and the Section continues its opposition to granting divorce on these grounds.

Albert E. Jenner, Jr. of Illinois, Chairman of the Section of Individual Rights and Responsibilities, reported that the Council of his Section had voted unanimously to support the Uniform Act as drafted by the Conference.

The Uniform Marriage and Divorce Act was then approved by the House by standing vote of 136 to 105.

Mr. Read next introduced the Uniform Residential Landlord and Tenant Act, reporting that the Act followed the trend of recent decisions and applied the law of contract rather than the pure law of property to leases, he moved approval of the Act.

Daniel M. Schuyler of Illinois, Delegate of the Section of Real Property, Probate and Trust Law, proposed the following resolution in conjunction with the Act:

[2] The full report of the Section on the Act appears at page 447.

*Resolved,* That the Section of Real Property, Probate and Trust Law be authorized to present the views of the American Bar Association regarding the Uniform Residential Landlord and Tenant Act with appropriate recommendations for implementation to state and local bar associations and to study the long-term advantages of uniformity on particular points of landlord-tenant and related laws as well as the relative advantages of existing local law, customs and practices; and that the National Conference of Commissioners on Uniform State Laws be urged to continue its special drafting committee.

The resolution was approved by voice vote of the House.

Joe Stamper of Oklahoma spoke in opposition to the Act, stating that many provisions of the Act imposed needless restrictions upon rural landlords. Mr. Read, speaking in response to Mr. Stamper, pointed out that the Conference recognized that there might be local conditions which will make adoption of a particular Uniform Act inappropriate.

Charles L. Goldberg of Wisconsin inquired about the method through which state legislatures become aware of the position of the Association on each uniform act. President Chesterfield Smith replied that, while legislatures considering uniform acts were always informed of the Association's position, the Standing Committee on Legislation engaged in affirmatively supporting these acts only when the state bar association in each state has indicated approval of such action.

After defeating a motion to lay the matter on the table, the House approved the Uniform Residential Landlord and Tenant Act by voice vote.

Mr. Read next moved approval of an amendment to the Uniform Controlled Substances Act. He explained that the amendment incorporated a position previously approved by the House that there should be no criminal laws punishing the simple possession of marijuana and that casual distribution of small amounts of marijuana, not for profit, should be treated as simple possession. By voice vote, the House approved the amendment.

After moving approval of the Uniform Drug Dependence Treatment and Rehabilitation Act, Mr. Read explained that the Act proposes a system for the handling of drug users which combines the criminal justice system and some civil systems with an over-riding control of a medical nature. The House approved the Act by voice vote after being informed by Albert E. Jenner, Jr., Chairman of the Section of Individual Rights and Responsibilities, of the unanimous approval of the Act by the Council.

Upon appropriate individual motions by Mr. Read and by voice vote without debate, the House then approved the Uniform Parentage Act, the Uniform Crime Victims Reparations Act, the Revised Uniform Abortion Act and the Uniform State Antitrust Act.

Mr. Read told the House that he had been informed that the Sections of Taxation and Real Property, Probate and Trust Law wished to request additional time to study the final three Acts proposed by the Conference, the Uniform Disclaimer of Transfers by Will, Intestacy or Appointment Act; the Uniform Disclaimer of Transfers under Nontestamentary In-

Case 3:05-cv-00165-KAB   Document   Entered on   Docket 08/09/2008   Page 90

Max Rheinstein

# MARRIAGE STABILITY, DIVORCE, AND THE LAW

The University of Chicago Press
Chicago and London

The University of Chicago Press, Chicago 60637
The University of Chicago Press, Ltd., London

© 1972 by The University of Chicago
All rights reserved. Published 1972
Printed in the United States of America

International Standard Book Number: 0-226-71773-9
Library of Congress Catalog Card Number: 79-169582

*392.5
R342m

'73 37

SAN FRANCISCO
PUBLIC LIBRARY

THE LIBERAL BREAKTHROUGH

384

various efforts made by the members of the committee to incite the interest of the public in the cause of divorce law reform and uniformity, and the elaboration of a prospectus and its submission to a number of foundations.[21]

In 1967 a generous grant was made by the Ford Foundation for research, deliberation, and drafting necessary for promulgation of a uniform law that would cover the entire law of the family rather than only the limited field of divorce. Upon the request of the special committee Professor Robert J. Levy of the University of Minnesota prepared a monographic study on conclusion of marriage and on divorce, which constituted a working basis for the committee's endeavors. In his report Levy emphatically rejected the matrimonial offense approach as obsolete and mischievous. A proposal generally to allow consent divorce apparently met with the fear that it might antagonize members of American legislatures. But Levy suggested that consent divorce might be considered for childless couples, to be granted after a reasonable cooling-off period. So Levy concluded that the American uniform law should be predicated clearly and exclusively upon the ground of irremediable marriage breakdown. But recognizing the vagueness of the term, the risk that it might be interpreted in many different ways and that it might be used to deny divorces contrary to present-day views, he proposed that the new law be predicated upon "breakdown with specifics." But what should be the specifics? No clear answer emerged from Levy's discussion of various possibilities, especially those that at one time or another had figured in the discussion in England.

The "specific" of presuming breakdown upon proof of a marital offense was repudiated. Charges of offense should be barred from divorce proceedings once and for all. Presumption of breakdown after a period of separation was not recommended either. Apparently American legislatures were not to be trusted to fix the period realistically short. Levy also declared it inadvisable to complicate the law with safeguards against the granting of divorces that would appear to be contrary to what might be called the public interest. He also declared it to be unwise to withhold an otherwise justified divorce in the alleged interest of the children or because the financial security of a party was not sufficiently assured.

The draft statutes which were presented by Levy and by Professor Herma Hill Kay of the University of California in Berkeley were thus little different from the approach of breakdown pure and simple that was to become the law of California.

21. HANDBOOK, 1966, at 184–97.

The Liberal Breakthrough, II

385

The proposed Uniform Marriage and Divorce Act was approved by the National Conference of Commissioners on Uniform State Laws in 1970. It will hardly be considered by any state legislature before it has been examined by the House of Delegates of the American Bar Association, which is expected to act upon it in 1971.

In its part dealing with "dissolution of marriage," the text more or less, but not completely, follows the example of the California law. Irretrievable breakdown pure and simple and without specifics is the only ground upon which a marriage is to be dissolved.[22] Even incurable insanity is no longer mentioned. There is no reference to irreconcilable difference as the cause of the breakdown. No guidance is given for the determination of this vague term. Irretrievable breakdown of marriage means whatever a court chooses it to mean. So it may mean one thing in a liberal court and another in a conservative.

The length of the road to freedom of remarriage also depends on judicial discretion. If both parties have stated under oath or affirmation that the marriage is irretrievably broken, or one of them has so stated and the other has not denied it, the court, after hearing, shall make a finding whether the marriage is irretrievably broken. But if one of the parties has denied under oath or affirmation that the marriage is irretrievably broken, the court shall consider all relevant factors, including the circumstances that gave rise to the filing of the petition and the prospect of reconciliation, and shall either make a finding whether the marriage is irretrievably broken or continue the matter for further hearing not less than thirty or more than sixty days later, or as soon thereafter as the matter may be reached on the court's calendar, and he may suggest to the parties that they seek counseling. At the adjourned hearing, the court shall make a finding whether the marriage is irretrievably broken.[23] The marriage will be dissolved if the court finds that the marriage is irretrievably broken and if, to the extent that it has jurisdiction to do so, the court has considered, approved, or made provision for child custody, child support, the maintenance of either spouse, and the disposition of property.[24]

Obviously, a party is not meant to be guilty of perjury if he has stated under oath that his marriage is irretrievably broken and the

22. § 302 (a) (2).
23. § 305.
24. § 303 (a). Under norms worked out by the Supreme Court of the United States, the court of a state has jurisdiction to dissolve a marriage if the plaintiff is a resident of the state. But it does not have jurisdiction to deal with the other issues unless the defendant is also a resident of the state or there are certain other contacts with the state.

# Irretrievable Breakdown –
## Not Defined, Judge's Role a "Ministerial" Function

**John B. Boatwright, Richmond, Virginia, served in the Virginia House of Delegates.
From the 1970 UMDA Transcript, page A56:**
MR. BOATWRIGHT [Va.]:  If you are not going to provide for a hearing, then it seems
to me you ought to really simplify and speed the thing up by merely authorizing the
parties to file a certificate in the office of the clerk of the court — no more — saying,
"We're divorced."  I understand that's the Russian style. [Laughter]

**Arthur L. Abrams, Newark, N.J. From the 1970 UMDA Transcript, page A59:**
MR. ABRAMS [N.J.]:  If we are going to put a hearing in here for political reasons, and
decide that we don't want, for political reasons, to just let the parties sign a paper, like
they used to do, but no longer do, in Russia, that's one thing.  But if we want to patch it
politically, then I support the motion to have a hearing to establish that they are of the
same mind they were when they signed the petition, but that's as far as I think it should
go.

**From the 1970 UMDA Transcript, page A60:**
MR. GIBSON:  Mr. Chairman, I would like to say a few words on this motion, because it
goes to the entire heart of the Act.  I think the Conference should understand the
importance of the motion.

Now, if by this Act you want to allow a consensual divorce, a divorce by
registration, why, now is the time to decide that fact.  I don't think many of the fifty
legislatures in the states will take an Act that provides for consensual divorce, and what it
amounts to if the motion carries is that you are using the court in a ministerial capacity to
carry out a clerk's function.

If you want to do that, go all the way, then.  Don't {A61} get the court involved.
You don't need a court order ordinarily to get married.  Now, if you want to allow a
dissolution of the marriage by a registration, enact a section to that effect.  But I don't
think many of the legislatures will buy that.

If you want to camouflage it, then, by saying, well, we are using a judicial process
because the parties have to file a petition, then when they file the petition the judge has
no discretion.  The judge has no discretion in the matter.

Now, this is based on a sound judicial discretion.  The judge uses its discretion,
which of course at times a judge does, or will.  There is a remedy for that.  But I don't see
how you can legislate on the basis that in every action a judge is going to be using his
discretion.  If he does, of course, he shouldn't be a judge, and he won't be a judge very
long.

Now, to take care of one or two isolated instances in a state or a county by taking
away all judicial discretion in this matter — you are making an Act, then, that is entirely
foreign to the concept of divorce at this time.  I will admit that this is an approach that is
advocated by some groups, and some people favor it.  It was considered in England, and

turned down. It was proposed to the California Legislature, {A62} and turned down; and I don't think this group should promulgate an Act saying that you can get divorced by consent. If you do, you are going to kill the Act in many states or kill the opportunity for adopting the Act.

I think the motion should be defeated.

(Footnote: Floyd R. Gibson, Kansas City, Missouri, was nominated by Lyndon Johnson in 1965 to the U. S. Court of Appeals for the Eighth Circuit. Served as chief judge 1974-79. Assumed senior status on December 31, 1979. Service terminated on October 4, 2001, due to his death.)

**Louis H. Burke (California Supreme Court Associate Justice) in a Sept. 26, 1969 letter to NCCUSL Special Committee on Marriage and Divorce:**
" I respectfully submit that if marriage is to be terminable by unilateral action without any judicial determination that the marriage is in effect dead, then the proceeding has no business in a court of law and should be relegated to a ministerial function in the marriage license bureau."

**Thomas P. Monahan, (Professor of Sociology, Villanova University, "Villanova, Pennsylvania), "National Divorce Legislation: The Problem and Some Suggestions" in *The Family Coordinator*, July 1973, page 355.**
Without arguing the merits of this "new" idea, it does mean that the innocent party to a divorce or the breakup of a marriage has not the legal protection as before, and the judiciary is moving into the position of becoming a mere administrative agency, and an expensive one at that. The experience of Russia in the 1920s, with its soon abandoned "post card" divorce system, comes to mind.

**Henry H. Foster, Jr., "Divorce Reform and the Uniform Act," *18 S. Dak. L. Rev.* (1973), page 578.**
There was deep animosity against family court systems, conciliation and reconciliation provisions, accompanied by a determination to eliminate judicial discretion wherever possible and to provide for automatic divorce upon unilateral demand. It was clear that the Reporters really favored administrative divorce upon request. Upon one occasion Reporter Levy confessed that he had no idea what "irretrievable breakdown" meant. All suggestions that the idea be defined or that guidelines be provided were bushed aside.

**Foster, page 583.**
The most important objections relate to sections 302 and 305 which cover the "irretrievable breakdown" ground. The objections are not to non-fault divorce as such, nor to "irretrievable breakdown" as the exclusive ground for divorce. These objections relate to the inadequate definition of that ground, and the failure to set forth meaningful guidelines for its operation. However, such has been done in most states which have recently adopted the breakdown ground.

**Foster, page 585.**
There is no discretion to deny a divorce.

**Foster, page 585.**
The Family Law Section had insisted that there be a definition of "irretrievable breakdown" or that guidelines be set forth, but the quoted language and a minor rewording of section 305 were all that the Commissioners would concede.

**Max Rheinstein, *Marriage Stability, Divorce, and the Law* (1972), p. 28-30.**
The version (of the California Family Law) that was ultimately adopted is poorly drafted. Indeed, its literal application is impossible. Any court may give it almost any meaning. If the statue was meant to provide for the termination of the marriage bond in the case of the factual breakdown of the marital community of life, it fails to indicate any standard by which one is to determine the meaning of the vague term of marriage breakdown. But the text makes things worse by requiring that the breakdown be 'irremediable' and that it be caused by 'irreconcilable differences.'  If one were to take literally the words 'irremediable' and irreconcilable,' no marriage could ever be judicially dissolved. Human conduct is even less predictable than the weather......So what is meant in the statute is obviously a marriage breakdown with a low probability of being remedied. But how low must the probability be:  20 percent, or 10, or 1, or 49?

**"Comment" following Section 302 of "Draft of Proposed Revised Uniform Marriage and Divorce Act," submitted by the American Bar Association Family Law Section, submitted November 9, 1972, and published in *18 S. Dak. L. Rev.* (1973) p. 697.**
Despite the fact that Reporter Robert Levy stated at the hearings on Section 302 that he himself did not know what "irretrievable breakdown" meant, and despite repeated criticism from the Family Law Section, the UM&DA Section 302 has not been modified to include definition or guidelines.  The result is a section which has no certain meaning and a ground for divorce which is not a justifiable issue, and that inevitably lead to divorce upon demand of one party.  Such a procedure could better be handled administratively than by a form of a judicial hearing.

**"Comment" following Section 305 of "Draft of Proposed Revised Uniform Marriage and Divorce Act," submitted by the American Bar Association Family Law Section, submitted November 9, 1972, and published in *18 S. Dak. L. Rev.* (1973) p. 699.**
The UM&DA's Section 305 has been completely deleted for the reason that it fails to set forth proper guidelines or definition of irretrievable breakdown and conciliation or reconciliation procedures and would permit granting of speedy divorce merely upon request of one party.

HISTORY OF HB 17-C

February 16, 1971 - It was the consensus of the Judiciary Committee to use HB 125 and the Uniform Marriage and Divorce Act as vehicles for staff to draft a Committee Bill.

March 14, 1971 - Staff draft of Committee Bill, Chapter 61, Marriage & Divorce Act, was presented to the Subcommittee on Family Law.  In discussing the child custody section it was agreed that the father should have equal consideration as is given the mother and that it should be spelled out in the bill to give the courts guidance.  See Page 22, Line 7.  Vote was taken in favor of including (f) in the bill.

March 29, 1971 - HB 736, Committee Bill, was voted on in Judiciary Committee and reported out favorably.  See Page 7, Lines 27-30.

April 9, 1971 - HB 736 passed the House with amendments.  See amendments attached.

April 29, 1971 - Senate Judiciary-Civil A Committee reported Committee Substitute for HB 736 favorable.  See Page 9, Lines 9-12.

CS HB 736 was passed in both the House and Senate.

June 4, 1971 - CS HB 736 was vetoed by the Governor.  Note comparison sheet of CS HB 736 and bill recommended by the Governor. See Page 10, Lines 19-22.

HB 17-C was introduced and passed House and Senate and became law. See page 10, Lines 19-22.

COPY

19    195

# Faults in Florida No-Fault

**Hurried drafting pen
draws stick figure**



**By VIRGINIA ANNE CHURCH**

*Virginia Anne Church is a partner in a Clearwater law firm, is active in Family Law Committees of The Florida Bar and the ABA, chairman of the Subcommittee on Law & Psychology (AEA) and Conciliation and Counseling Committee (ABA); executive director of the Interprofessional Family Council; vice president of the International Academy of Law and Science and past president of the Florida Association of Women Lawyers. She holds the A.B. and J.D. degrees from the University of Miami, and has done graduate work in government at Miami, in psychology at the University of South Florida, and is now working on a Ph.D. degree with the Graduate School of the Union for Experimenting Colleges and Universities in juro-psychology. She writes a monthly commentary for Progressive Woman and has contributed to CLE practice manuals.*

FLORIDA IS NOT the first to pass no-fault legislation in the area of family relations. It is likely the first to have attempted so sweeping a change without preliminaries and in so bold and bare a manner. It is one thing to state purposes to be (a) To preserve the integrity of marriage and to safeguard meaningful family relationships; (b) To promote the amicable settlement of disputes that have arisen between parties to a marriage; (c) To mitigate the potential harm to the spouses and their children caused by the process of legal dissolution of marriage,[1] and quite another to accomplish them by a legislative act. It is doubtful that Florida's present act is a vehicle for such accomplishment.

When compared with the hard fought, thoroughly studied, and carefully compromised California or Iowa acts or with the Uniform Code, the Florida law appears a stick figure contrasted to a full fashion drawing. Although neither the California nor the Iowa acts are considered surpassing works of art, the exposed and very bare bones of the Florida act are the conspicuous result of limited input and a hurried drafting pen.

*The 1971 Dissolution of Marriage Law.* The Florida act provides for the abolition of all previous defenses to divorce, condonation, recrimination, collusion and laches.[2] More than this, the act promulgates a "state policy"[3] concerning dissolution of marriage to meet all the goals set out above.

Following the abolishment of defenses, the legislature then abolished all prior grounds, and divorce itself, as we knew it. In its stead there has been created a new half world somewhere between the no-fault therapeutic divorce and the old adversary procedure with ameliorated inequities.[4]

*Four Areas of Major Change.* Although there are many new provisions in the act, the majority of them are codification of existing case law or specific statements of change of policy designed to ameliorate existing inequities in case law practice. There are four major areas, however, which embody concepts radically foreign to prior law:

1. All the defenses have been abolished along with the concept of guilt or innocence. Misconduct is neither punishable nor relevant to the right to dissolution of the marriage.

2. Mother and father have indeed been made joint custodians of the minor children with equal consideration for custody and also equal responsibility for support of the children and of each other.

3. The concept that the total realities of the situation are to be considered without hypocrisy or artificial restriction in determining money awards, reductions, or modifications, and that alimony may be only rehabilitative, not a pension.

4. The court's right under the rules to order medical or psychological examination of a party claiming to be a fit custodian and the right to have state welfare make a home study and social work study of the respective homes in custody cases have been broadened to include the right to order counseling by a wide variety of helping profession specialists acceptable to the parties.

These four innovations and their implications and weaknesses will be the text of this article with special reference to comparison with the statutes and commentaries in other no-fault acts.

# Divorce

A. *Review of No-Fault Divorce.*
Florida's act, if viewed as something more than a new disguise for old rules, represents the first notations on the tabla raza of Florida Dissolution Law. The first draft of the act established "irreconcilable differences" as the basic grounds for divorce. The act that became law substituted for this familiar phrase, "that the marriage is irretrievably broken."

Research shows this is not, after all, an unprecedented phrase, nor are Florida courts (officers of the courts and judges) left to wander about in the uncharted swamp of conjecture.

1. *Irretrievably Broken and Similar Bases in Other Acts.*

a. California's grounds for irreconcilable differences,[5] but further defined in their statute as, "which have caused the irremedial breakdown of the marriage," and their commentary further describes this as "those grounds which are determined by the court to be substantial reasons for not continuing the marriage, and make it appear that the marriage should be dissolved."[6]

b. Iowa requires "that there has been a breakdown of the marriage relationship to the extent that the legitimate objects of matrimony have been destroyed and there remains no reasonable likelihood that the marriage can be preserved."[7]

c. Texas retained seven grounds for divorce but set out as the first and foremost: "A divorce may be decreed without regard to fault, if the marriage has become insupportable because of the discord or conflict of personalities that destroy the legitimate ends of the marriage relationship and prevents the expectation of reconciliation."[8]

d. In the *Uniform Marriage and Divorce Act*, Section 305,[9] the identical language selected by Florida appears:
Section 305. *(Irretrievable Breakdown.)*
(a) If both of the parties by petition or otherwise have stated under oath or affirmation that the marriage is irretrievably broken, or one of the parties has so stated and the other has not denied it, the court, after hearing, shall make a finding whether the marriage is irretrievably broken.
(b) If one of the parties has denied under oath or affirmation that the marriage is irretrievably broken, the court shall consider all relevant factors, including the circumstances that gave rise to the filing of the petition and the prospect of reconciliation, and shall
(1) make a finding whether the marriage is irretrievably broken, or
(2) continue the matter for further hearing not less than 30 or more than 60 days later, or as soon thereafter as the matter may be reached on the court's calendar and may suggest to the parties that they seek counseling. At the adjourned hearing, the court shall make a finding whether the marriage is irretrievably broken.

2. *Differences and Similarities.*

In interpreting the similarities of these acts and case decisions which may have been reported in these states, it is necessary to look a little deeper into some of the differences in the overall reform acts of these other states.

a. *California* had two goals in passage of its reform legislation: elimination of the fault

doctrine as it applies to (a) dissolution of marriages and (b) as it affects unequal awards of property and affects custody and alimony awards.

California is a community property state and was concerned over the former practice of justifying unequal division of marital property despite legislation, based on the fault doctrine.[10] To this end, the legislature passed additional provisions governing introduction of evidence, etc., not specified in the Florida act:
"In any pleadings or proceedings for legal separation or dissolution of marriage under this part, including depositions and discovery proceedings, evidence of specific acts of misconduct shall be improper and inadmissible, except where child custody is in issue and such evidence is relevant to establish that parental custody would be detrimental to the child, or at the hearing where it is determined by the court to be necessary to establish the existence of irreconcilable differences."

The California Assembly Report on the new law stated that its intent was "to eliminate[11] (not mitigate[12]) lurid testimony and acrimony. It is essential that pleadings and evidence be strictly controlled."

California also made a legislative change of preference. There had been a preference stated for fathers of children having reached the age "for requiring guidance and teaching as to trade and education. This has been changed to say that custody of children of tender years shall be awarded to the mother, all things being equal."

The last major difference in California law is that con-

**569**

CHAPTER 61, FLORIDA STATUTES,
IS NOT UNCONSTITUTIONALLY VAGUE,
UNCERTAIN, OR INDEFINITE.

The Constitution does not require that statutory terms be scientifically precise. <u>Roth v. United States</u>, 354 U.S. 476, 1 L. Ed. 2d 4198 (1957).  The court in <u>Roth</u>, discussing vague terms in obscenity statutes, stated:

> "Many decisions have recognized that these terms of obscenity statutes are not precise.  This court, however, has consistently held that the lack of precision is not itself offensive to the requirements of due process. ' . . . the constitution does not require impossible standards;' all that is required is that the language 'conveys sufficiently definite warning of the proscribed conduct when measured by common understanding and practices . . .' <u>United States v. Petrillo</u>, 332 U.S. 1, 78, 98 L. Ed. 1877, 1883."

In <u>Sproles v. Binford</u>, 286 U.S. 374, 76 L. Ed. 1167 (1932), the Supreme Court pointed out that "the requirement of reasonable certainty does not preclude the use of ordinary terms to express ideas which find adequate interpretation in common usage and understanding."

Guidelines provided by the new Chapter 61 are not substantially different from those provided by the old law. Florida's no fault divorce law is based on the Uniform Marriage and Divorce Act which was drafted by the National Conference of Commissioners on Uniform State Laws, August 1-7, 1970. The National Conference took care to point out in the Uniform Marriage and Divorce Act that the term:

8

# EXHIBIT C: